**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank MARRALE and Alphonse Marrale,**
**Defendants-Appellants.**

**No. 206, 229, Docket 82–1182, 82–1184.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 30, 1982.

Decided Dec. 13, 1982.

Certiorari Denied March 21, 1983.
See 103 S.Ct. 1434, 1435.

Diane F. Giacalone, Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for plaintiff-appellee.

Mark F. Pomerantz, Brooklyn, N.Y. (Lewis D. Cohen, Ronald P. Fischetti, Brooklyn, N.Y., on the brief), for defendant-appellant Frank Marrale.

Jay Goldberg, New York City, for defendant-appellant Alphonse Marrale.

Before KEARSE, CARDAMONE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Frank Marrale ("Frank") and his son, Alphonse Marrale ("Alphonse"), appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, after a jury trial before Henry Bramwell, *Judge.* Frank was convicted of theft from a foreign shipment in violation of 18 U.S.C. §§ 659 and 2 (1976) and bank larceny in violation of 18 U.S.C. §§ 2113(b) and 2 (1976). Frank and Alphonse were convicted of conspiracy to steal and possess moneys stolen from a foreign shipment, in violation of 18 U.S.C. § 371 (1976). Frank was sentenced to ten years' imprisonment and a $5,000 fine on the foreign shipment theft count, ten years' imprisonment and a $5,000 fine on the bank larceny count, and five years' imprisonment and a $10,000 fine on the conspiracy count, the jail terms to be served consecutively and the fines to be cumulative. Alphonse was sentenced to the custody of the Attorney General for an indeterminate period of treatment and supervision as a young adult offender, pursuant to 18 U.S.C. § 5010(b) (1976). Finding no merit in the defendants' challenges to their convictions, we affirm.

## I. BACKGROUND

Since neither defendant challenges the sufficiency of the evidence, a brief summary of the evidence at trial, taken in the light most favorable to the government, will suffice. In 1981, Frank was employed as a driver by Armored Express, Inc. ("Armored"), a firm in the business of transporting shipments of money for commercial companies and banks. According to Frank's co-worker Steve Mui, who testified for the government, in June 1981 Frank and Mui began to discuss the possibility of stealing bags of money they were to transport to John F. Kennedy International Airport. Frank stated that he knew three people who could prepare facsimile bags to be substituted for the bags of cash in order to facilitate the theft. Frank did not identify his partners but told Mui that if anything went wrong Mui should contact Alphonse, Frank's 19-year old son, who would know "the business" and the people with whom Frank was doing business. In November 1981, Frank and Mui executed their scheme, stealing a shipment of $2 million being sent by Republic National Bank to

Kennedy Airport for transport to Seoul, Korea. Frank and Mui were to receive $400,000 apiece after the money was "laundered," with the remaining $1.2 million going to Frank's partners who had provided the bogus bags and to persons who would launder the money.

After the theft was discovered, Mui was questioned and was asked to take a lie detector test. Mui told Frank he was nervous about the test, and Frank told Mui to get pills from Alphonse to slow down his reactions and help him pass the test. Mui obtained two pills from Alphonse which he took in preparation for the test. Notwithstanding the medicinal aid, Mui believed he had failed the lie detector test, and, after consulting an attorney, he agreed to cooperate with the government in return for not being prosecuted.

Following the agreement, Mui had several conversations, which he taped, with Frank concerning arrangements for Mui to collect his $400,000. Mui eventually was paid $300,000 (which he turned over to the FBI) and continued to try to collect the remaining $100,000. In these conversations Frank expressed apprehension of detection by the FBI and several times suggested that Alphonse might make the delivery of the $100,000, since no one was following Alphonse. Finally, Mui arranged to have

Frank call him at a certain telephone booth on December 9, 1981, at 4:00 p.m. The call was made, however, not by Frank but by Alphonse, who told Mui "we gonna lay low for awhile" because of people "following my father." Alphonse stated that he would call Mui the next day when "I'll know . . . what the rest of the story is." This conversation too was taped.

Frank was arrested in the wee hours of the morning of December 10, 1981. At approximately 7:00 on the same morning, federal agents went to the apartment of Frank Marrale, where Alphonse lived, and there arrested Alphonse. In response to the agents' questions about the $2 million theft and about Mui, Alphonse stated that he did not know Mui and that he had not spoken to anyone named Steven Mui.

In a five-count indictment, Frank and Alphonse were charged with conspiring to steal and possess money stolen from a foreign shipment, in violation of 18 U.S.C. § 371 (count 1); Frank was charged with stealing money from a foreign shipment, in violation of 18 U.S.C. §§ 659 [1] and 2 (count 2), and with larceny from a bank whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), in violation of 18 U.S.C. §§ 2113(b) [2] and 2 (count 4); Alphonse was charged with aiding and

---

1. 18 U.S.C. § 659 provides, in pertinent part, as follows:

> Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of 'or which constitute an interstate or foreign shipment of freight, express, or other property; or
>
> Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen; . . .
>
> . . . .
>
> Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; . . . .

2. 18 U.S.C. § 2113(b) provides, in pertinent part, as follows:

> Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both;
>
> . . . .

Section 2113(f) defines the term "bank" as follows:

> As used in this section the term "bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation.

abetting a theft from a foreign shipment, in violation of 18 U.S.C. §§ 659 and 2 (count 3), and with aiding and abetting a larceny from a bank whose deposits were insured by FDIC, in violation of 18 U.S.C. §§ 2113(b) and 2 (count 5). At the close of the government's case counts 3 and 5 against Alphonse were dismissed pursuant to Fed.R.Crim.P. 29. The jury found the defendants guilty as charged on all of the remaining counts. As described above, Frank Marrale was sentenced to serve consecutive prison terms and pay cumulative fines on counts 1, 2, and 4. Alphonse was sentenced to an indeterminate prison term as a youthful offender.

On appeal, Frank challenges the imposition of consecutive sentences on counts 2 and 4, contending that Congress did not intend to authorize cumulative penalties under §§ 659 and 2113(b) for theft from a foreign shipment and theft from a bank, respectively, in the context of a single criminal transaction such as that undertaken here. Alphonse challenges his conviction on the grounds that his statements following his arrest should not have been admitted in evidence, and that certain statements by the prosecutor in summation deprived him of a fair trial. Finding no merit in appellants' contentions, we affirm the convictions.

## II. FRANK MARRALE

Prior to trial, Frank Marrale asserted that counts 2 and 4 were multiplicious and moved to require the government to elect whether it would proceed on count 2, charging theft from a foreign shipment, or count 4, charging bank larceny.[3] The contention that the counts were multiplicious rested on the premise that Congress did not intend to authorize cumulative penalties for a person who violated both § 659 and § 2113(b) in a single criminal transaction. The district court denied the motion, relying on *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Blockburger,* the Supreme Court stated that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. The district court here concluded that counts 2 and 4 were not multiplicious because each offense required proof of a fact that the other did not.

Frank concedes on appeal, as he did below, that counts 2 and 4 against him are not multiplicious under the *Blockburger* test, but he argues that that test is inapplicable. He contends that the Federal Bank Robbery Act, 18 U.S.C. § 2113,[4] is a comprehen-

---

**3.** Alphonse made a similar motion with respect to counts 3 and 5 which charged him with aiding and abetting both the theft from interstate commerce and the bank larceny. Since counts 3 and 5 were dismissed at the close of the government's case the multiplicity issue became moot with regard to Alphonse.

**4.** The operational provisions of § 2113 are as follows:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to com-

mit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or

Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management, or possession of any

sive scheme that provides the exclusive remedy for conduct falling fully within its coverage and that an independent provision such as § 659, *see* note 1 *supra,* may not be invoked to fragment what was in fact a single criminal transaction. We are unpersuaded by Frank's reasoning and the cases on which he relies.

■ The recent teaching of the Supreme Court mandates a three-step inquiry by which the courts may determine whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions. *See Albernaz v. United States,* 450 U.S. 333, 336–42, 101 S.Ct. 1137, 1141–44, 67 L.Ed.2d 275 (1981). The starting point for the analysis is the language of the provisions. If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision. *Id.* at 336, 101 S.Ct. at 1141. The court's next task is to determine whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one. In making this determination the *Blockburger* test is employed, and if the court finds that each offense requires proof of a fact that the other does not, it should presume that multiple punishments are authorized. *Id.* 450 U.S. at 337–40, 101 S.Ct. at 1141–43. The final step is to test this presumption against the legislative history of the provisions to discover whether a contrary congressional intention is disclosed. If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments. *Id.* at 340–42, 101 S.Ct. at 1143–44.[5]

■ Pursuit of this analysis in the present case leads us to the conclusion that Congress authorized multiple punishments for the crimes of bank larceny and theft from a foreign shipment. Sections 659 and 2113(b) appear in distinct chapters of the Criminal Code. Each unequivocally interdicts certain acts. Each section provides a penalty for violation of its provisions, in each case a maximum of ten years' imprisonment and a $5000 fine. There is no ambiguity in the language of either section to intimate that punishment under that section was not authorized; and there is no suggestion in the language that either section supersedes or is subordinate to the other.

Further, as the district court found, the *Blockburger* test is easily satisfied here. Section 659 requires proof that the theft was from an interstate or foreign shipment;

bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

5. The *Albernaz* Court also stated that "the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution." 450 U.S. at 344, 101 S.Ct. at 1145.

no such interstate connection need be proven to establish a violation of § 2113. Section 2113(b), on the other hand, requires proof that the property stolen was property in the care, custody, control, management, or possession of a bank that is a member of the Federal Reserve System, or is organized under the laws of the United States, or has its deposits insured by FDIC; no such bank connection need be proven to establish a violation of § 659. Accordingly, unless the legislative history evinces a contrary intent, Congress must be presumed to have intended to authorize cumulative punishments for violations of §§ 659 and 2113(b).

We are aware of no such contrary indication. The legislative histories of § 2113, which was enacted two decades after the first version of § 659, *see infra,* and of amendments to § 659 that postdated § 2113 are silent as to the relationship between the two sections and as to whether consecutive sentences were thought to be permissible.[6] Frank has called to our attention no congressional reports or debates in connection with either section that indicated in any way that the Federal Bank Robbery Act was intended to supplant § 659 or its predecessor section in any circumstances. Under the teaching of *Albernaz,* we must assume from Congress's silence that Congress intended to authorize such cumulative punishments as would be consistent with the *Blockburger* rule. *See Albernaz v. United States, supra,* 450 U.S. at 341–42, 101 S.Ct. at 1144.

The conclusion that cumulative punishments are authorized is buttressed by the indications that § 659 and § 2113 were addressed to different goals. *See Albernaz v. United States, supra,* 450 U.S. at 343, 101 S.Ct. at 1145 (inference of congressional intent to authorize cumulative punishments for a single agreement constituting a conspiracy to import marijuana in violation of

21 U.S.C. § 963 (1976) and a conspiracy to distribute it in violation of 21 U.S.C. § 846 (1976) is supported by the fact that importation and distribution are "separate evils"). The predecessor of § 659 was enacted in 1913. 18 U.S.C. § 409, Pub.L. No. 62–377, 37 Stat. 670 (1913); *see also* 18 U.S.C. §§ 410–411, Pub.L. No. 62–377, 37 Stat. 670 (1913). The congressional debates as to its purpose leave a confused picture, *see, e.g.,* 49 Cong.Rec. 1780–82, 2481 (1913); but the provision was early interpreted as evincing Congress's intention not so much to punish larcenies as to protect the integrity of interstate and foreign commerce, *White v. United States,* 273 F. 517 (2d Cir.1921). Thus, this Court stated that the section "does much more than extend the crime of larceny to interstate or foreign shipments. . . . The essential object of this statute is to create, define, and punish the offense of abstracting or unlawfully having in possession goods while in interstate or foreign transit, and thereby interfering with interstate or foreign commerce." *Id.* at 518. *See also United States v. De Normand,* 149 F.2d 622, 624 (2d Cir.) (same), *cert. denied,* 326 U.S. 756, 66 S.Ct. 89, 90 L.Ed. 454 (1945). Over the years, the statute has been amended to close loopholes in its coverage, and was recodified as § 659 in 1946, Pub.L. No. 79–534, 60 Stat. 656. There has been no indication, however, that any of the amendments was intended to alter the goal of the section to prevent interference with interstate and foreign commerce. The early interpretations in *White, supra,* and *De Normand, supra,* thus remain valid interpretations of § 659 today, *United States v. Padilla,* 374 F.2d 782, 786 & n. 6 (2d Cir. 1967), and this Court has often reaffirmed those holdings. *See United States v. Astolas,* 487 F.2d 275, 279 (2d Cir.1973) (purpose of § 659 is to protect flow of interstate commerce), *cert. denied,* 416 U.S. 955, 94

---

**6.** In *Prince v. United States,* 352 U.S. 322, 325, 77 S.Ct. 403, 405, 1 L.Ed.2d 370 (1957), the Court described § 2113 as "a unique statute of limited purpose [with] an inconclusive legislative history." The question in *Prince* was whether Congress intended to allow the addition of punishment for a lesser included offense

(entry of bank with intent to rob) to the penalty for the major crime (bank robbery). With respect to that question the legislative history was no doubt ambiguous and inconclusive; but this has no bearing on the intended coordination between § 2113 and § 659, as to which the legislative history is not ambiguous but silent.

S.Ct. 1968, 40 L.Ed.2d 305 (1974); *United States v. Thomas,* 396 F.2d 310, 315 (2d Cir.1968) (same); *United States v. Berger,* 338 F.2d 485, 487 (2d Cir.1964) (same), *cert. denied,* 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1965).

The Bank Robbery Act, on the other hand, attempts principally to achieve a different goal: protection of financial institutions in which the federal government has an interest. The legislation was introduced in Congress as an act "to provide punishment for certain offenses committed against banks, organized or operating under laws of the United States, or any member of the Federal Reserve System." *See, e.g.,* 78 Cong.Rec. 2946 (1934) (Senate); *accord* 78 Cong.Rec. 133 (1934) (House). Congress enacted these provisions during the Depression, in the congressional session immediately following that in which it had established FDIC, an agency which was in part federally funded, to guarantee bank deposits. It described the bank robbery provisions as a means of "protect[ing] the institutions in which [the Federal Government] is interested." H.R.Rep. No. 1461, 73d Cong., 2d Sess. 2 (1934). *See Way v. United States,* 268 F.2d 785, 786 (10th Cir.1959) (purpose of § 2113(b) was "to safeguard the stability and integrity of federal banks" and "to protect and safeguard the financial stability of the Federal Reserve Bank System and the members thereof"). Thus, although the legislative history of § 2113 contains a passing reference to the fact that bank robbery was often committed by organized gangsters who fled across state lines, H.R.Rep. No. 1461, 73d Cong., 2d Sess. 2 (1934), the Congressional debates centered on how best to protect federal banks, not on how to protect interstate or foreign commerce, *see, e.g.,* 78 Cong.Rec. 8132–33 (1934); and no provision of § 2113 has ever required proof that interstate commerce— or interstate flight—was in any way involved.

The divergent concerns leading to enactment of §§ 659 and 2113(b) serve to distinguish this case from the authorities relied on by Frank Marrale. Frank relies on language in a number of cases, none of which involved § 659, to the effect that § 2113 is a comprehensive statute and that any conduct within its purview is punishable only under § 2113 and not under other sections that might also apply. We read those authorities, however, to stand for the more limited proposition that cumulative punishments should not be imposed when the other section that has been violated is viewed as reaching the very evil that § 2113 was intended to reach. In *Simpson v. United States,* 435 U.S. 6, 10, 98 S.Ct. 909, 911, 55 L.Ed.2d 70 (1978), for example, the Supreme Court reversed a judgment imposing consecutive sentences for armed bank robbery in violation of § 2113(d) and use of a firearm to commit a felony in violation of 18 U.S.C. § 924(c) (1976), because both sections "clearly . . . are addressed to the same concern and designed to combat the same problem." In *United States v. Canty,* 469 F.2d 114, 126–29 (D.C.Cir.1972), the court invalidated cumulative punishments for robbery by force and violence in violation of § 2113(a) and assault with a dangerous weapon in violation of D.C.Code § 22–502 (1967), those two sections being directed at the same evil; the *Canty* court upheld, however, cumulative punishments for violation of § 2113(a) and for possession of a dangerous weapon in violation of D.C.Code § 22–2304 (1967), because "[t]he prohibition on carrying a dangerous weapon is designed to serve interests that the federal bank robbery scheme does not purport to serve." 469 F.2d at 129. In *United States v. Beck,* 511 F.2d 997, 1000 (6th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975), the court invalidated cumulative punishments for extortion of bank assets in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976), and bank theft in violation of § 2113(b). The court doubted that the Hobbs Act had been intended to reach extortion of bank assets, but ruled that to the extent that it was so intended, it would reach precisely the same evil reached by § 2113(b). The court also noted its agreement with *Canty*'s affirmance of cumulative punishments for violation of § 2113 and another statute with a different goal.

See also United States v. DiGeronimo, 598 F.2d 746, 750 (2d Cir.) (invalidating cumulative punishments for robbery from interstate commerce in violation of Hobbs Act, and receipt of goods stolen from interstate commerce in violation of § 659 where, on the facts, the Hobbs Act count was "a functional substitute for a charge under the theft provisions of section 659," and there was no basis for inferring a congressional deviation from established principles that an individual may not be convicted of both robbery and receipt of the goods stolen [7]), cert. denied, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); United States v. Snell, 550 F.2d 515 (9th Cir.1977) (invalidating cumulative punishments for attempted extortion of bank assets in violation of Hobbs Act and conspiracy to commit bank robbery in violation of §§ 371, 2113(a)).

In sum, we conclude that the differing concerns evident in Congress's enactment of §§ 659 and 2113, respectively, support the inference drawn from the language of the sections, the different elements of the offenses, and the legislative history, that Congress intended to authorize cumulative penalties for a transaction that violated both sections. Accordingly we see no basis for vacating Frank Marrale's sentences on counts 2 and 4.

### III. ALPHONSE MARRALE

Alphonse Marrale challenges his conviction on two grounds. He contends that his post-arrest statements were inadmissible because they were involuntary, and that the prosecutor deprived him of a fair trial by making improper remarks during her summation. We reject both contentions.

#### A. Post-Arrest Statements

Alphonse contends that his conviction must be set aside because of the improper receipt in evidence of false statements he made to federal agents after his arrest. He challenges these statements principally on the ground that they were involuntarily made because the agents tricked him into making the statements by questioning him while he was still sleepy, by failing to inform him of the charges against him, and by falsely telling him that his father had implicated him in the theft.

Alphonse raised this contention in a pretrial motion to suppress his false statements, and an evidentiary hearing was held on the motion. Several special agents of the FBI described the entry into the Marrale apartment and the arrest and questioning of Alphonse. Alphonse was informed in the apartment that he was under arrest for conspiracy to steal $2 million from an armored truck service. At that time he was neither given Miranda warnings nor questioned. Alphonse was then driven to an FBI office, and during that drive, prior to any interrogation, he was given Miranda warnings. In the questioning that ensued, Alphonse denied knowing Mui—one of the false exculpatory statements he sought to have suppressed. After arriving at the FBI office Alphonse was again given Miranda warnings, following which he executed a written waiver of his rights. Alphonse then admitted knowing Mui, but made another false exculpatory statement by denying that he had telephoned Mui the previous afternoon.

On the basis of the evidence presented at the hearing, the district court found that Alphonse had been given adequate Miranda warnings, that he had not been subjected to physical abuse or intimidation by the agents, and that, in all the circumstances, Alphonse had knowingly, intelligently and voluntarily waived his Fifth and Sixth Amendment rights. These findings are not clearly erroneous, and the motion to suppress Alphonse's false exculpatory statements was properly denied.

Alphonse also appears to argue on appeal that his post-arrest statements should have been suppressed because the agents' entry into the Marrale apartment was unlawful and therefore the arrest of Alphonse was also unlawful. We find no indication that Alphonse raised this argu-

---

**7.** See Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); United States v. Gaddis, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976).

ment in the district court. His motion for suppression raised only the arguments going to the voluntariness of his statements, described above, and did not even hint at a contention that the arrest was unlawful. Indeed, at the suppression hearing, when Alphonse's counsel started to raise the possibility that Alphonse's detention had been unlawful, he did so not on the premise that the agents had no authority to enter the Marrale apartment, but only on the untenable premise that an arrest warrant was required.[8] In any event, the government attorney objected to the injection of this issue on the ground that the legality of the arrest had not been challenged. The court sustained the objection, (Suppression hearing at 65), and Alphonse did not pursue the matter further. The government thus had no incentive to offer such proof as might have been available to show exigent circumstances or consent, justifying a warrantless entry, see *Payton v. New York,* 445 U.S. 573, 586–90, 100 S.Ct. 1371, 1380–82, 63 L.Ed.2d 639 (1980), nor to request that the court make findings as to the lawfulness of entry. We conclude that Alphonse is barred from challenging the lawfulness of his arrest on this appeal. *See United States v. Vasquez,* 638 F.2d 507, 530 n. 15 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981).

## B. *The Prosecutor's Conduct*

Alphonse's principal claim on appeal is that the prosecutor's summation deprived

him of a fair trial. He challenges a number of her statements as derogatory of his defense or of his counsel, or as injecting the prosecutor's beliefs and credibility into the case, or as vouching for the truthfulness of Mui, or as misstating the facts. Alphonse contends that since the district court had stated that the government's case against him was "skimpy," (Hearing on motion to dismiss at 16), the challenged statements of the prosecutor were sufficiently unfair to require that he be given a new trial. We disagree. We have reviewed all of Alphonse's assertions and find only two to be worthy of extended discussion.

First, we are unpersuaded that the prosecutor improperly made disparaging remarks about Alphonse's counsel or his defense that Alphonse was not a knowing participant in the conspiracy, but was instead merely a stupid and obedient son following the directions of his father, Frank.[9] Alphonse's attorney bolstered this claim by repeatedly referring to Alphonse as a "boy" during the trial and by giving directions to Alphonse as to when to stand up and when to sit down. In response, the prosecutor argued in summation that Mr. Goldberg had treated Alphonse in a "condescending way" and that Mr. Goldberg "wants you to think that his client was not capable of doing anything except the mindless following of his father's orders." She also hypothesized that the evidence showed Alphonse was a capable, intelligent partici-

---

8. Alphonse does not contend that probable cause did not exist for his arrest, nor could he in light of the information provided to the FBI by Mui. Since probable cause existed, no arrest warrant was required. *Carroll v. United States,* 267 U.S. 132, 156–57, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925); *see also Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975).

9. To the extent that the prosecutor's statement that "I submit that [Alphonse's defense of obedience] is a defense woven out of the thread of desperation and thread that unwravels [*sic*] before you because Alphonse Marrale is wrong," (Tr. 955–56), commented improperly on the credibility of the defense case, we conclude that it did not deprive Alphonse of a fair trial in light of the facts that (1) it was but one sentence in a summation that lasted an hour

and a half, (2) the evidence at trial was sufficient to convict Alphonse of conspiracy, and (3) the trial court adequately instructed the jury that an attorney's remarks during summation are not to be taken as evidence, warned that lawyers are sometimes overzealous in their cause, and gave reminders that the jury is the judge of the facts of the case. *United States v. Modica, supra. See United States v. White,* 486 F.2d 204, 206 (2d Cir.1973), *cert. denied,* 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974), upholding conviction where prosecutor's summation had charged twice that defendant was "lying" and repeatedly asserted that the defense was "fabricated"—*e.g.,* "the defendant has fabricated these incidents in order to bolster a specious, meritless argument." *Id.* at 206 n. 7.

pant in the conspiracy, "[n]ot as Mr. Goldberg portrayed Alphonse Marrale, not a dupe with no ability to say no, no ability to think, but as his father's trusted partner." Since a prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense, *see, e.g., United States v. Miller,* 478 F.2d 1315, 1318 (2d Cir.), *cert. denied,* 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973); *United States v. Sawyer,* 443 F.2d 712, 713–14 (D.C.Cir.1971), we find no basis for overruling the determination of the district court—which surely was in a better position than we to evaluate subtle behavioral defense tactics—that in the circumstances of the present case that portion of the summation was proper.[10]

Nor do we believe the prosecutor's admonition to the jury not to "be fooled" by the tactics of Alphonse's attorney falls into the category of impermissible conduct. Statements designed to appeal to the jury's emotions or to "inflame the passions or prejudices of the jury," American Bar Association Standard 3–5.8(c), are improper. *See, e.g., United States v. Modica,* 663 F.2d 1173, 1178–81 (2d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982), and cases cited therein. Thus, we have condemned remarks such as "you have to be born yesterday" to believe appellant's defense, and the defense is "an insult to your intelligence," *United States v. Gonzalez,* 488 F.2d 833, 836 (2d Cir.1973); defendant's "testimony is so riddled with lies it insults the intelligence of 14 intelligent

people sitting on the jury," *United States v. Drummond,* 481 F.2d 62, 64 (2d Cir.1973); and "Don't let [the defendant] walk out of this room laughing at you," *United States v. Modica, supra,* 663 F.2d at 1180.

The remarks made by the prosecutor at the present trial pale beside the examples just given.[11] The prosecutor here three times warned the jury not to be "fooled" by the defense tactics. While the word "fool" used as a noun is usually demeaning, so that we would surely have disapproved if the prosecutor had warned the jury not to "be made fools of" or not to be "made to appear fools," her use of the verb "fool" seems relatively innocuous, since one who is fooled is not thereby necessarily a fool, and one who fools another does not necessarily exhibit a moral defect. While repetition of the phrase "Don't be fooled" obviously could be overdone, we conclude that, in light of the permissible desire to dispute defense histrionics, the prosecutor's three such admonitions in the present case did not deprive Alphonse of a fair trial.

## CONCLUSION

The judgments are affirmed.

---

**10.** In response to Alphonse's motion for a mistrial based on this part of the government's summation, the following colloquy occurred:

Ms. Giacalone [Assistant United States Attorney]:

. . . . .

Your Honor, what I did, I believe was entirely appropriate in light of the defense taken in this case. The defense was a very pointed one.

In another case this summation would not have been appropriate. In this case the defense was Alphonse Marrale is too dumb to have committed this crime.

The Court: Actually, that was the defense.
Mr. Goldberg: I did not inject my view—
The Court: The way you went at it.
Mr. Goldberg: Absolutely, and I stand by it. How does it justify a response—

The Court: In light of the trial of this case, I don't find anything in Miss Giacalone's summation which was prejudicial and I am going to deny your application.
(Tr. 997–98.)

**11.** Even the language in the examples quoted did not necessarily result in reversal of the defendants' convictions. In *United States v. Modica, supra,* we found that in all the circumstances the statements had not denied the defendant a fair trial and thus did not warrant reversal. The convictions in *United States v. Gonzalez, supra,* and *United States v. Drummond, supra,* were reversed, although in *Gonzalez* the reversal was based on "the combination of" prosecutor's statements and an error in the jury charge. *See also United States v. White, supra* note 9.