UNITED STATES of America, Appellee,

v.

Tamer Trad MOURAD, Joseph Hargrave, and Adnan Yacteen, Defendants-Appellants.

Nos. 445–447, Dockets 83–1194, 83–1197 and 83–1198.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1983.

Decided Feb. 24, 1984.

Carl M. Bornstein, New York City (Jacob Laufer, and Bornstein & Laufer, New York City, on the brief), for defendant-appellant Mourad.

Irving Anolik, New York City, for defendant-appellant Hargrave.

William P. O'Neill, Springfield, Mass. (Matroni, Dimauro, Fitzgerald & Sweeney, Springfield, Mass., on the brief), for defendant-appellant Yacteen.

Paul Schectman, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Janette P. Patterson, Andrew J. Lavender and Barry A. Bohrer, Asst. U.S. Attys., New York City, on the brief), for appellee.

Before TIMBERS, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

TIMBERS, Circuit Judge.

Appellants Mourad, Hargrave and Yacteen appeal from judgments entered May 18, 1983 in the Southern District of New York, Thomas P. Griesa, *District Judge,* after an eight week jury trial, convicting them of violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the Act), and related offenses.

Specifically, appellants were convicted of the following offenses: all appellants of conspiring to import heroin, 21 U.S.C. § 963 (1982), and conspiring to distribute heroin, 21 U.S.C. § 846 (1982); appellant Mourad of organizing a continuing criminal enterprise, 21 U.S.C. § 848 (1982); all appellants of various substantive violations of the narcotics laws for importing and distributing heroin, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 952, 960 (1982); appellants Mourad and Yacteen of interstate travel to facilitate the distribution of heroin, 18 U.S.C. § 1952 (1982); and all appellants of using interstate facilities to promote the distribution of heroin, 18 U.S.C. § 1952 (1982).

For the reasons stated below, we affirm the convictions of all appellants on all counts; and we remand the case of Mourad to the district court solely for the purpose of reconsideration of his sentence in accordance with our opinion herein.

## I.

### FACTS AND PRIOR PROCEEDINGS

During the course of the eight week trial a great deal of evidence was adduced which resulted from a five month investigation by the Drug Enforcement Administration (DEA). We shall summarize only so much of the evidence as we believe necessary to an understanding of our rulings on the legal issues raised on appeal. There was evidence from which the jury could have found as follows.

The evidence included the testimony of four accomplice witnesses, evidence of physical surveillances, evidence of the fruit of various searches, and proof of unexplained wealth. Such evidence permitted the jury to find that appellants were high ranking figures in an international narcotics smuggling operation that transported a continuous flow of large quantities of heroin from Lebanon to the United States over a four year period.

Mourad, a Lebanese national, directed the movement of heroin into the United States from Lebanon. Yacteen, who was Mourad's chief assistant, helped transport and safeguard the enterprise's heroin. Hargrave supervised the distribution network in the New York area.

The smuggling operation began in 1979 when Mourad and Hargrave travelled to Lebanon to meet with a heroin refiner. On that trip they were introduced to a former Lebanese customs official, Mohamed Berro, who agreed to help them covertly transport heroin to the United States. Berro agreed with Mourad and Hargrave that a dummy corporation should be set up, with offices in New York City and Beirut, to act as a cover for the frequent traveling which would be necessary. Nassif Berro, the son of this former customs official, was one of the government's chief witnesses at trial. He was present at the initial negotiations and later picked up the first shipment of heroin for delivery to his father, who arranged for shipment to Mourad and Hargrave in New York. An airline pilot acted as courier and delivered the heroin to Mourad.

Several weeks after delivery of the first shipment, a second purchase of heroin was

made from the same refiner. Again, Berro, Sr. arranged to have a courier deliver the heroin to a relative of Mourad in Los Angeles. Berro, Sr. was paid about $90,000 for his help.

Hargrave and Mourad again travelled to Lebanon in the spring of 1980. They contacted Mourad's longtime friend, Mahmoud Yaghi, who later testified for the government. He arranged for a villa for Hargrave, Mourad and their friends. He also introduced Hargrave and Mourad to a Lebanese banker, to whom Hargrave gave $200,000 while Yaghi watched. Yaghi introduced them to a new heroin supplier, Hargrave having expressed dissatisfaction with the quality of the heroin supplied earlier. Hargrave and Mourad engaged Yaghi to transport some of the new heroin to New York. While in New York, Yaghi witnessed two heroin transactions involving Hargrave and Mourad.

In April 1981, Mourad and Yacteen travelled to Lebanon. Again Yaghi was engaged to arrange for delivery of a new shipment of heroin. He and another courier delivered it personally. Both Yaghi and the courier later were arrested in New York by DEA agents.

In October 1981, another shipment was intercepted when another Lebanese courier was arrested while claiming his luggage in New York. This courier, Emil Ghazali, also later testified for the government.

Additional shipments from Lebanon to the United States took place in February, March and June of 1982. Berro's son was arrested in New York City while attempting to sell the June delivery to an undercover agent. Two days later, Hargrave was arrested on an indictment returned in the District of New Jersey for income tax evasion. At the time of his arrest he placed a telephone call to his wife in the presence of government agents. During this telephone conversation, he made incriminating statements in code. Later, while imprisoned in the same facility as Berro, Hargrave made a number of incriminating statements to Berro.

On November 7, 1982, DEA agents executed search warrants at the homes of Mourad and Yacteen in Agawam and East Long Meadow, Massachusetts. The search of Mourad's home resulted in the seizure of a pound of unrefined heroin; quantities and traces of mannitol, a heroin dilutant; glassine envelopes; hashish and marijuana; $26,000 in cash; and a narcotics ledger written in Arabic. The search of Yacteen's home resulted in the seizure of a false-bottomed suitcase containing traces of heroin; a triple beam scale; mini-scales; a heat sealer; glassine bags; hollow-point bullets; a .357 Magnum handgun; $10,000 in cash; and financial records concerning Yacteen's narcotics trafficking. The agents also seized the telephone books of Mourad and Yacteen which contained the telephone numbers of their co-conspirators.

Mourad and Yacteen subsequently were arrested and confined at the Franklin House of Detention in Massachusetts. There they made a number of incriminating statements to a fellow prisoner who later testified for the government.

On January 4, 1983, appellants Mourad, Hargrave and Yacteen were indicted, in the instant case, along with Jamil Hameiah, Ghassan Saleh, Nawal Yacteen and Nemr Hazime. Trial began on February 7, 1983 and was concluded on April 4, 1983. Mourad, Yacteen, and Hargrave were convicted of various charges set forth in the margin.[1]

---

1. Mourad was convicted of unlawfully, wilfully and knowingly importing, distributing and possessing with intent to distribute narcotics and conspiring to do the same, engaging in a continuing criminal enterprise, and travelling interstate and using interstate telephone communications to carry out narcotics traffic as charged in counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 15, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 846, 848, 952, 960, 963 and 18 U.S.C. §§ 2, 1952 (1982).

Yacteen was convicted of unlawfully, wilfully and knowingly importing, distributing and possessing with intent to distribute narcotics and conspiring to do the same, and travelling interstate and using interstate telephone communications to do so as charged in counts 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 15, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 846, 952, 960, 963 and 18 U.S.C. §§ 2, 1952 (1982).

Saleh, Hazime, and Nawal Yacteen were acquitted. Hameiah remains a fugitive. On May 18, 1983, the court sentenced Mourad to a total of 45 years imprisonment and a $100,000 fine; Hargrave to a total of 45 years imprisonment and a $120,000 fine;[2] and Yacteen to 15 years imprisonment as a young adult offender pursuant to 18 U.S.C. § 4216 (1982). From their judgments of conviction, appellants have taken the instant appeals.

Of the various claims of error raised on appeal, we rule as follows on what we find to be the essential ones: (1) appellants were not denied a fair trial by alleged prosecutorial misconduct; (2) disappearance of a witness did not prejudice appellants; (3) the court's evidentiary rulings which are challenged were correct; and (4) since the narcotics conspiracy conviction of appellant Mourad merged with his continuing criminal enterprise conviction, his case is remanded solely for the purpose of reconsideration of his sentence.

We shall discuss seriatim our rulings stated above.

## II.

## ALLEGED PROSECUTORIAL MISCONDUCT

Appellants contend that their convictions should be reversed because of alleged prosecutorial misconduct. Their chief argument is that the defense was placed at a disadvantage because production of material required by 18 U.S.C. § 3500 (1982) (the Jencks Act), Fed.R.Crim.P. 16, and *Brady v. Maryland*, 373 U.S. 83 (1963), was delayed. Appellants claim that they there-

fore were unable to use such material effectively.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

■ It is true that some material was not promptly turned over to counsel for appellants.[3] We believe, however, that there are at least two reasons why such prosecutorial conduct does not warrant reversal. First, production of the evidence was delayed, not suppressed.[4] Appellants had several possible remedies at various times of which they chose not to avail themselves, such as requesting a continuance, recalling the witness for further examination, or introducing rebuttal evidence. Second, there had been no showing that the delay resulted in any prejudice, or even that the evidence was material to the issue of guilt. The trial judge carefully scrutinized the possibility of prosecutorial misconduct and discovery abuse. Indeed, he struck the testimony of one witness when the government inadvertently failed to produce one of the witness's reports. In *United States v. Sperling*, 726 F.2d 69 (2 Cir. 1984), we recently considered a case where a tape which contained impeaching evidence was not produced by the government until after the trial. We affirmed the conviction because there was no likelihood that the lack of evidence reasonably could have affected the verdict. 726 F.2d at 72. A similar conclusion is inescapable in the in-

---

Hargrave was convicted of unlawfully, wilfully and knowingly importing, distributing and possessing with intent to distribute narcotics, conspiring to do the same, and using interstate telephone communications to do so as charged in counts 1, 2, 4, 5 and 15 in violation of 21 U.S.C. §§ 846, 963 (1982) and 18 U.S.C. §§ 2, 1952.

**2.** Hargrave's sentence also covered income tax charges filed against him in the District of New Jersey, to which he pleaded guilty before Judge Griesa pursuant to Fed.R.Crim.P. 20.

**3.** For example, the government failed to turn over telephone books seized from Ghazali, one of the heroin couriers, until the night before he testified. Also, the prosecutor gave defense counsel a copy of a business card bearing the name and telephone number of an unindicted co-conspirator only one day before it was offered in evidence.

**4.** *E.g.*, 18 U.S.C. § 3500 requires that the government produce relevant statements only *after* the witness has completed his direct examination.

stant case where appellants have failed to show any prejudice whatsoever.

 We hold that appellants' claim of alleged prosecutorial misconduct is without merit.[5]

### III.

### DISAPPEARANCE OF A WITNESS

 Yaghi was called as a witness by the government on February 22, 1983. Cross-examination began that afternoon. By the end of February 23, counsel for appellants had completed their cross-examination of him.

On the morning of February 24, the government belatedly produced the minutes of Yaghi's sentencing hearing which disclosed that he had lied to the sentencing judge. To eliminate the possibility of prejudice, the court postponed further cross-examination until that afternoon to allow defense counsel to examine this important impeachment evidence. Counsel for one of the defendants not involved on this appeal fully cross-examined Yaghi on the sentencing minutes, as well as on Yaghi's conversation with a defense investigator in which Yaghi supposedly confessed to having falsely implicated the defendant. By the end of February 24, each of appellants' counsel, except counsel for Mourad, had had an opportunity to re-open his cross-examination of Yaghi concerning the sentencing minutes.

On February 25, Yaghi failed to return for completion of his testimony. The court, noting that virtually all cross-examination had been completed, indicated that it would not grant any motion for a mistrial, nor would it strike Yaghi's testimony. On March 10, the government stated that it still had not been able to locate Yaghi. The court thereupon permitted defense counsel to introduce, in the presence of the jury, evidence of Yaghi's flight. A substantial portion of the defense case was devoted to that issue and to other attacks on Yaghi's credibility.

Under these circumstances, appellants' claims—pressed especially by Hargrave—that they were denied a complete right to confrontation of the witness Yaghi are without merit. As for Hargrave, prior to Yaghi's disappearance Hargrave had completed his cross-examination; he had been permitted to re-open his cross-examination; and he had stated expressly that he had no further questions to ask.

During cross-examination of Yaghi, defense counsel had elicited that he had committed a revenge murder in Lebanon and that that murder had occurred in a courtroom; that he had lied to DEA agents at the time of his arrest; that his defense at his own trial was a sham; that he had lied to a grand jury in New Jersey; and that he had written letters to Hargrave and Mourad in which he solicited substantial sums of money and threatened otherwise to be "on the side of the government".

In this context, we find reasonable the court's finding that it was the government that had been chiefly prejudiced by Yaghi's disappearance, since the government had been denied the opportunity to rehabilitate its witness. Moreover, the evidence of Yaghi's flight had been fully disclosed to the jury, enabling them to draw their own conclusions.

 Mourad's argument with respect to Yaghi focuses upon his claim that he was denied the right to question a defense investigator about Yaghi's statement to the investigator that Yaghi was being pressured by the government agents to testify and that he would tell them anything unless one or more of the defendants paid him money. Mourad contends that the in-

---

**5.** Appellants assert various other claims of prosecutorial misconduct which clearly are without merit. The fact that a grand jury indictment is based solely on hearsay evidence does not automatically require its dismissal. *Costello v. United States,* 360 U.S. 359 (1956). Similarly, the court properly overruled defense counsel's objection to a handwriting expert's testimony. The prosecutor informed defense counsel the previous day of the likelihood of such testimony, but did not produce the report at that time because it was not completed until that night. The expert had not been engaged until well into the trial.

vestigator's testimony was relevant to Yaghi's bias. The court excluded the testimony on the ground that it was extrinsic evidence of bias which was inadmissible because Yaghi was not available to explain or deny the statements attributed to him as required by Fed.R.Evid. 613(b). We believe that the court's ruling in this respect was not prejudicial to appellants in view of similar evidence already before the jury, e.g., Yaghi's letters to Mourad and Hargrave demanding money and threatening to testify for the government if he did not receive the money.

We hold that appellants were not prejudiced by the disappearance of the witness Yaghi and that the court's rulings with respect thereto, including the exclusion of the testimony of the investigator, were not erroneous.

## IV.

## EVIDENTIARY RULINGS

### (A)

The search of Yacteen's home resulted in the seizure of a .357 Magnum handgun which was admitted in evidence against all appellants.

■ Hargrave contends that its admission against him constitutes reversible error. Physical evidence found in the home of one conspirator is admissible against all conspirators to show the existence of the conspiracy. *United States v. Praetorius*, 622 F.2d 1054, 1063 (2 Cir.1979), *cert. denied*, 449 U.S. 860 (1980). Guns constitute important evidence of a narcotics conspiracy. "[S]ubstantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment."

*United States v. Wiener*, 534 F.2d 15, 18 (2 Cir.), *cert. denied*, 429 U.S. 820 (1976). The admission of Yacteen's gun was significant evidence probative of the scope of the conspiracy as to all appellants.

■ Hargrave challenges the admission against him of three small bags of hashish found in Mourad's home. While it is not clear from the record whether this evidence was relevant to the heroin conspiracy, its admission could hardly have resulted in significant prejudice. In the context of the evidence of kilograms of high-purity heroin, it is unlikely that this small quantity of hashish found in Mourad's home could have prejudiced Hargrave.

### (B)

Hargrave contends that the court improperly admitted the testimony of two DEA agents regarding incriminating statements he made in their presence during a telephone call to his wife at the time of his arrest.[6] We find no merit in Hargrave's claim that this evidence violated his Sixth Amendment rights.[7]

■ The relevant inquiry with respect to this type of claim under the Sixth Amendment is "whether the Government has interfered with the right to counsel of the accused by 'deliberately eliciting' incriminating statements." *United States v. Henry*, 447 U.S. 264, 272 (1980). The record before us does not show any such deliberate attempt to elicit evidence. The agents merely told Hargrave that he could use the telephone. They did not suggest that he call any particular person nor did they propose topics of conversation. And there is no indication that offering Hargrave the telephone was a ploy "designed to elicit an incriminating response". *United States v.*

---

**6.** Hargrave called his wife following his indictment for income tax violations and told her to "only call 'Mr. T,' call it my way." Other evidence established that the "Mr. T" referred to was appellant Tamer Trad Mourad. The two agents were in the same room. They stood approximately four and six feet from Hargrave during the telephone conversation. Hargrave's careful choice of words indicates that he knew

that the agents were listening and that his conversation was not confidential.

**7.** Hargrave's claim that the agents violated his Fourth Amendment rights was not raised in the district court and therefore is not properly before us. *United States v. Fuentes*, 563 F.2d 527, 531 (2 Cir.), *cert. denied*, 434 U.S. 959 (1977).

*Guido,* 704 F.2d 675, 677 (2 Cir.1983), quoting *Rhode Island v. Innis,* 446 U.S. 291, 302 n. 7 (1980). We find that the statements made by Hargrave during the telephone conversation were not illegally obtained by the agents and that they were properly admitted in evidence.

We hold that no error was committed by the court in the challenged evidentiary rulings.

V.

## MERGER OF CONSPIRACY AND CONTINUING CRIMINAL ENTERPRISE CONVICTIONS

 Mourad contends that the sentences imposed on him for all Title 21 convictions except his § 848 conviction, see note 15, *infra,* violate the double jeopardy clause of the Fifth Amendment by subjecting him to punishment for lesser included offenses which merged with the continuing criminal enterprise conviction under § 848.[8] We hold that Congress did not intend to authorize cumulative punishment for conspiracy and continuing criminal enterprise convictions under the Act. We therefore vacate the sentences imposed on Mourad

on the conspiracy counts and remand his case solely for the purpose of reconsideration of his § 848 sentence.

The Supreme Court in *Jeffers v. United States,* 432 U.S. 137 (1977) (plurality opinion), first dealt with the problem presented by convictions for conspiracy and a continuing criminal enterprise in violation of § 848.[9] *Jeffers* has been the subject of a number of differing interpretations.[10] We read the actual holding narrowly: a defendant found guilty of both a conspiracy and a continuing criminal enterprise may not be fined more than the maximum authorized by § 848. *United States v. Gomberg,* 715 F.2d 843, 849 (3 Cir.1983). The Supreme Court expressly declined to settle "definitively" the issue as to whether § 846 was a lesser included offense of § 848.[11] Rather, the Court relied upon an assumption that arguendo § 848 required agreement between co-conspirators. 432 U.S. at 149, 153 n. 20, 155.

 Instead of finding § 846 to be a lesser included offense of § 848, as we have previously held, *United States v. Sperling,* 560 F.2d 1050, 1060 (2 Cir.1977), the Court in *Jeffers* relied on a multiple

---

8. Since the law does not permit conviction for a lesser included offense if proof of the greater offense necessarily involves proof of the lesser, *Blockburger v. United States,* 284 U.S. 299 (1932); *Gavieres v. United States,* 220 U.S. 338 (1911), a conviction and sentence imposed for a lesser included offense must be vacated when there has been a conviction for the greater offense. *United States v. Rosenthal,* 454 F.2d 1252, 1255 (2 Cir.), *cert. denied,* 406 U.S. 931 (1972).

9. *Jeffers* arose in a different context than *Whalen v. United States,* 445 U.S. 684 (1980), or the instant case. The grand jury returned two indictments against Jeffers, one charging violation of § 846 and the other charging violation of § 848. The conspiracy indictment charged the same predicate offenses and involved the same time period as the continuing criminal enterprise indictment. The defendant opposed consolidation on the grounds that the parties charged in the two indictments differed and much of the § 846 evidence would be inadmissible on the § 848 charge. The court denied the motion to consolidate.

The defendant first was tried on the § 846 indictment and was found guilty. A motion to

dismiss the § 848 indictment on the ground of double jeopardy was denied. After trial of the § 848 indictment, the defendant was found guilty; he was sentenced to life imprisonment and the maximum fine was imposed.

The Supreme Court held that the defendant had waived his double jeopardy claim by opposing consolidation of the trials. 432 U.S. at 152. This conclusion was challenged by the dissent.

10. *E.g., United States v. Smith,* 690 F.2d 748, 750 (9 Cir.1982), *cert. denied,* 464 U.S. ___ (1983); *United States v. Chagra,* 669 F.2d 241, 261–62 (5 Cir.), *cert. denied,* 459 U.S. 846 (1982); *United States v. Chagra,* 653 F.2d 26, 32–34 (1 Cir. 1981), *cert. denied,* 455 U.S. 907 (1982); *United States v. Barnes,* 604 F.2d 121, 155–56 (2 Cir. 1979), *cert. denied,* 446 U.S. 907 (1980); *United States v. Valenzuela,* 596 F.2d 1361, 1364–65 (9 Cir.), *cert. denied,* 444 U.S. 865 (1979).

11. Justice Blackmun's lengthy defense of the reasonableness of such an interpretation, however, makes it clear that the Court did not wholly disregard that issue.

punishment analysis [12] and an examination of Congressional intent. The Fifth Amendment protects against multiple punishments for the same offense. *North Carolina v. Pearce, supra* note 12, 395 U.S. at 717; *Whalen v. United States, supra* note 9, 445 U.S. at 689. Considering the double jeopardy implications of multiple punishments imposed in a single criminal proceeding, the Court in *Whalen* held that the federal courts were precluded from imposing consecutive sentences unless authorized by Congress. Statutory construction thus serves as the basis for resolving a multiple punishment double jeopardy claim. *Missouri v. Hunter,* 459 U.S. 359 (1983); *Albernaz v. United States,* 450 U.S. 333 (1981); *United States v. Marrale,* 695 F.2d 658, 662 (2 Cir.1982), *cert. denied,* 460 U.S. —— (1983).

Although the Court in *Jeffers* concluded that Congress did not sanction cumulative punishment for violations of § 846 and § 848, there is some ambiguity about the extent of its holding with respect to Congressional intent concerning other substantive and conspiracy offenses included in the Act.[13] Some language seems to support an interpretation that *all* offenses merge with a § 848 conviction.[14] For example, the Court's conclusion that § 848 "reflects a comprehensive penalty structure that leaves little opportunity for pyramiding of penalties from *other sections* of the Comprehensive Drug Abuse Prevention and Control Act of 1970", 432 U.S. at 156 (emphasis added), seems to indicate that all other provisions of the Act, substantive as well as conspiratorial, merge within the inclusive ambit of § 848.

 Our reading of Justice Blackmun's plurality opinion in *Jeffers* leads us to conclude that only cumulative punishment for conspiracy violations is prohibited, and that cumulative punishment for substantive offenses and a continuing criminal enterprise under § 848 does not violate the double jeopardy clause. Justice Blackmun explicitly recognized the propriety of charging substantive crimes and conspiracies separately, but held that there were no equally valid policy reasons for charging conspiracies and continuing criminal enterprises separately. 432 U.S. at 157. Absent explicit language to the contrary, we adhere to the well established view that conspiracy statutes do not foreclose punishment for substantive offenses. We see no reason to assume that § 848 is intended to cover substantive violations.

This conclusion is consistent with our approach in *United States v. Barnes,* 604 F.2d 121, 155–56 (2 Cir.1979), *cert. denied,* 446 U.S. 907 (1980). There we upheld the district court's decision not to impose sentence on the conspiracy count since the maximum statutory penalty had been imposed on the continuing criminal enterprise count; but we affirmed the sentences imposed for the various underlying substantive offenses.

We vacate the sentences imposed on Mourad on the conspiracy counts (Counts 1 and 2, 21 U.S.C. §§ 846 and 963) [15] and we

---

**12.** In *North Carolina v. Pearce,* 395 U.S. 711 (1969), the Court held that the Fifth Amendment guarantee against double jeopardy prohibits three separate actions: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense.

**13.** We reject the government's contention that *Jeffers* meant only to address § 846. There is no logical reason to single out § 846 conspiracies from others under the Act.

**14.** This interpretation is followed by the Fifth Circuit, *United States v. Chagra, supra* note 10, 669 F.2d at 261–62, and the Third Circuit, *United States v. Gomberg, supra,* 715 F.2d at 851.

**15.** Mourad was sentenced as follows:

| Group | Count | Statute | Sentence |
|-------|-------|---------|----------|
| A | 3 | 21 U.S.C. § 848 | 40 years + $50,000 |
| B | 2 | 21 U.S.C. § 963 | 15 years + $25,000 |
| B | 4 | 21 U.S.C. §§ 952, 960<br>18 U.S.C. § 2 | 10 years + $25,000 * |
| B | 7 | 21 U.S.C. §§ 952, 960<br>18 U.S.C. § 2 | 10 years * |
| B | 10 | 21 U.S.C. §§ 952, 960<br>18 U.S.C. § 2 | 10 years * |
| C | 1 | 21 U.S.C. § 846 | 15 years |
| C | 5 | 21 U.S.C. § 846<br>18 U.S.C. § 2 | 10 years * |
| C | 8 | 21 U.S.C. §§ 812,<br>841(a)(1),<br>841(b)(1)(A)<br>18 U.S.C. § 2 | 10 years * |
| C | 11 | 21 U.S.C. §§ 812,<br>841(a)(1),<br>841(b)(1)(A)<br>18 U.S.C. § 2 | 5 years * |

* Plus lifetime special parole.

remand his case to the district court with directions to reconsider the sentence imposed under § 848, keeping in mind that the district court may consider whether to increase the § 848 sentence. *See McClain v. United States,* 643 F.2d 911 (2 Cir.1981) (Van Graafeiland, J.). The lifetime special parole provisions imposed under Counts 4, 5, 7, 10, 11 and 12 are not to be disturbed. *See United States v. Chagra,* 669 F.2d 241, 261–62, 266 (5 Cir.), *cert. denied,* 459 U.S. 846 (1982).

We have carefully considered all other claims of error raised by appellants and we find them to be without any merit whatsoever.

Appellants were convicted after a fair trial of serious offenses committed beginning five years ago. We order that the mandate issue forthwith.

All convictions are affirmed; the case of appellant Mourad is remanded solely for the purpose of reconsideration of his sentence in accordance with this opinion.

| Group | Count | Statute | Sentence |
|-------|-------|---------|----------|
| C | 12 | 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) 18 U.S.C. § 2 | 5 years * |
| D | 6 | 18 U.S.C. §§ 1952, 2 | 5 years |
| D | 9 | 18 U.S.C. §§ 1952, 2 | 5 years |
| D | 13 | 18 U.S.C. §§ 1952, 2 | 5 years |
| D | 15 | 18 U.S.C. §§ 1952, 2 | 5 years |

* Plus lifetime special parole.

The prison sentences in Group B are to be served consecutively for a total of 45 years. The prison sentences in Group C are to be served consecutively for a total of 45 years. The prison sentences in Group D are to be served consecutively for a total of 20 years.

The 40-year sentence in Group A, the total 45-year sentence in Group B, the total 45-year sentence in Group C, and the total 20-year sentence in Group D are to be served concurrently.