757 F.2d 1359
 UNITED STATES of America, Appellee,
v.
Kenneth THOMAS, Guy Thomas Fisher, Ishmael Muhammed, Frank
Alphonse James, Thomas Forman, Wallace Rice, James
Wheelings, Elmer Thomas Morris, Jr.,
Defendants-Appellants.
 Nos. 275, 276, 277, 278, 279, 280, 281 and 348, Docket
84-1010, 84-1024, 84- 1025, 84-1026, 84-1027,
84-1028, 84-1041 and 84-1023.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 15, 1984.
Decided March 11, 1985.
 
 William M. Kunstler, New York City (Robert H. Gombiner, Mark B. Gombiner, Ronald L. Kuby, New York City, of counsel), for appellant G.T. Fisher.
 David A. DePetris, New York City (Genay Ann Leitman, Law Offices of David A. DePetris, New York City, of counsel), for appellant W. Rice.
 Guy L. Heinemann, New York City, for appellant J. Wheelings.
 Maurice H. Sercarz, New York City, for appellant K. Thomas.
 Martin Geduldig, New York City, for appellant E.T. Morris, Jr.
 Barry M. Fallick, New York City (Rochman, Platzer & Fallick, New York City, of counsel), for appellant I. Muhammed.
 Frank A. Lopez, Brooklyn, N.Y., for appellant T. Forman.
 James T. Moriarty, New York City, for appellant F.A. James.
 Benito Romano, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Jess T. Fardella, Barry A. Bohrer, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for appellee United States.
 Before NEWMAN, CARDAMONE and DAVIS*, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 Eight defendants appeal from their convictions in the Southern District of New York on January 12, 1984 following a six-week trial before United States District Judge Milton Pollack and a jury. All defendants were tried under a 15 count indictment that charged narcotics, firearm and RICO violations of the most serious sort. Four of the defendants received life sentences and the other four were sentenced to terms ranging from 20 to 51 years. The violations of law charged against the various defendants briefly described are:
 
 
 2
 21 U.S.C. Sec. 846--conspiracy to violate narcotics laws
 
 
 3
 21 U.S.C. Sec. 848--operating continuing criminal narcotics enterprises
 
 
 4
 21 U.S.C. Sec. 841(a)(1)--possession with intent to distribute and distributing heroin
 
 
 5
 21 U.S.C. Sec. 844--unlawful possession of cocaine
 
 
 6
 18 U.S.C. Sec. 922(h)--unlawful receipt of a firearm
 
 
 7
 18 U.S.C. Sec. 924(c)--unlawfully carrying a firearm during the commission of a felony
 
 
 8
 18 U.S.C. Sec. 1962(c)--substantive RICO crimes --drug trafficking, murder, attempted murder and conspiracy to commit murder
 
 
 9
 18 U.S.C. Sec. 1962(d)--conspiracy to violate the racketeering laws.
 
 
 10
 18 U.S.C. Sec. 241--conspiracy to murder government witnesses.
 
 
 11
 The chart below identifies the statute violated and the count in the indictment on which the individual defendant was charged for that violation, whether the defendant was found guilty or not guilty, and the sentence he received.
 
 
 12
 INDIVIDUAL DEFENDANTS
---------------------------------------------------------------
 Kenneth Guy T. Frank Ishmael
Statutes Thomas Fisher James Muhammed
Violated (Counts) (Counts) (Counts) (Counts)
---------------------------------------------------------------
21 U.S.C. (1) guilty (1) guilty (1) guilty (1) guilty
Sec. 846
---------------------------------------------------------------
21 U.S.C. (2) guilty (3) guilty (5) guilty
Sec. 848
---------------------------------------------------------------
21 U.S.C. (7) guilty (8) guilty
Sec. 841(a)(1)
---------------------------------------------------------------
21 U.S.C. (9) guilty
Sec. 844
---------------------------------------------------------------
18 U.S.C. (10) Guilty
Sec. 922(h)
---------------------------------------------------------------
18 U.S.C. (13) guilty (13) guilty (13) guilty (13) guilty
Sec. 1962(d)
---------------------------------------------------------------
18 U.S.C. (14) not (14) guilty (14) guilty (14) not
Sec. 1962(c) guilty guilty
---------------------------------------------------------------
18 U.S.C. (15) not (15) not (15) not
Sec. 241 guilty guilty guilty
---------------------------------------------------------------
Sentence 20 years Life Life Life
 $25,000 $150,000 $135,000 $62,500
 fine fine fine fine
---------------------------------------------------------------
 INDIVIDUAL DEFENDANTS
---------------------------------------------------------------
 Wallace Thomas James Elmer
Statutes Rice Forman Wheelings Morris, Jr.
Violated (Counts) (Counts) (Counts) (Counts)
---------------------------------------------------------------
21 U.S.C. (1) guilty (1) guilty (1) guilty (1) guilty
Sec. 846
---------------------------------------------------------------
21 U.S.C. (4) guilty (6) not
Sec. 848 guilty
---------------------------------------------------------------
21 U.S.C. (8) guilty (11) guilty
Sec. 841(a)(1)
---------------------------------------------------------------
18 U.S.C. (12) guilty
Sec. 924(c)
---------------------------------------------------------------
18 U.S.C. (13) guilty (13) guilty (13) guilty (13)guilty
Sec. 1962(d)
---------------------------------------------------------------
18 U.S.C. (14) guilty (14) not (14) guilty (14) guilty
Sec. 1962(c) guilty
---------------------------------------------------------------
18 U.S.C. (15) not (15) not (15) not (15) not
Sec. 241 guilty guilty guilty guilty
---------------------------------------------------------------
Sentence Life 35 years 50 years 51 years
 $125,000 $37,500 $50,000 $50,000
 fine fine fine fine
 
 
 13
 Although a large number of issues are raised, only a few merit discussion.
 
 I. FACTS
 
 14
 According to the proof at trial, all the defendants and several co-conspirators (including Leroy "Nicky" Barnes, James Fisher and Joseph Hayden) were associated in a huge narcotics ring run by a governing body called the "Council." In existence for 12 years--from 1972 to 1983--the Council purchased bulk quantities of pure heroin. Its members were Barnes, Hayden, James, Guy Fisher, Rice, Muhammed and Forman. The Council's purpose was to pool the members' resources, share narcotics sources, allocate sales territories, adjudicate disputes among members and handle the narcotics business of jailed members. Each Council member had a separate narcotics business and employed subordinates to dilute and distribute the heroin in his territory. The Council also dealt in cocaine, PCP, and marijuana. Council members routinely approved the murders of those suspected of being potential witnesses against the Council or of people who had been insubordinate.
 
 
 15
 The three defendants who were not members of the Council--Wheelings, Morris and Thomas--were connected to the Council's business. Wheelings, along with Walter Centano who later was a government witness, was a member of the "crew" of "mill workers" in Guy Fisher's narcotics business, and eventually became Fisher's partner. Elmer Morris and Kenneth Thomas were also members of Fisher's "crew." Morris, a former Tuckahoe, New York police officer, was responsible for providing the Council with information about suspected police informants.
 
 II. ANONYMOUS JURY
 A. Impanelling The Jury
 
 16
 Prior to trial the government moved that the voir dire be conducted without disclosing the names, addresses, or places of employment of prospective jurors. In support of its motion, the government submitted an affidavit of an Assistant United States Attorney (AUSA) that requested that jurors be kept anonymous to protect them either from retaliation or the fear of retaliation. The affidavit stated that jurors might reasonably fear "harassment, retaliation or worse" from the defendants who, it was claimed, were responsible for the murder of several individuals that the Council believed were government witnesses. The affidavit asserted that the Council had agreed to pay a million dollars for the murder of government witness Nicky Barnes. The government also cited the widespread notoriety the case had received and the serious charges the defendants faced, which left them "little to lose by tampering with witnesses or obstructing the trial." When papers in opposition to the motion were filed, the court heard oral argument. After argument, the government filed an additional affidavit from a different AUSA, which stated that Nicky Barnes had informed the affiant that defendant Guy Fisher had bribed a juror at a prior trial at which Fisher had obtained a hung jury. The affiant alleged that a reliable informant told him that Fisher had paid the juror $25,000 to obtain a hung jury and that Fisher had attempted to have witnesses killed. Fisher's counsel filed an answering affidavit that labelled the jury tampering allegations "hogwash," and requested a hearing on this issue, which was denied.
 
 
 17
 The district court later decided that the jury should be anonymous and sequestered, and on voir dire instructed prospective jurors not to reveal their names, addresses or places of business, although he did ask those from the Bronx and Manhattan what part of the county they were from. Judge Pollack explained to the jurors that he was keeping their identity anonymous to prevent media curiosity from interfering with their sworn duty to consider only the evidence when deciding the case.
 
 B. Impact on Presumption of Innocence
 
 18
 Appellants claim that the impanelling of an anonymous jury deprived them of due process by destroying the presumption of innocence. They argue that the impanelling of an anonymous jury always and in all cases destroys that presumption and robs defendants of due process. Adoption of such a per se rule is rarely advisable in due process analysis.
 
 
 19
 Strictly speaking the "presumption of innocence" is not a presumption but an assumption that defendant is innocent of any unlawful conduct absent facts to the contrary. The phrase more accurately refers to the burden of proof cast upon the prosecution of producing evidence of defendant's guilt and then persuading the jury of that guilt beyond a reasonable doubt. McCormick's, Law of Evidence Sec. 342, at 805-06 (2d ed. 1972). The concept cautions the jurors to put out of their minds "all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced." 9 Wigmore, Evidence Sec. 2511, at 407 (3d ed. 1940). The elementary principle that a shield of innocence surrounds a defendant on trial reaches back in history at least to early Roman law. See Coffin v. United States, 156 U.S. 432, 453-54, 15 S.Ct. 394, 402-03, 39 L.Ed. 481 (1895). Recognition of this principle and its enforcement are part of the foundation of our system of criminal justice. A particular practice--here the impanelling of an anonymous jury--and its impact on the presumption of innocence must therefore receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense. Estelle v. Williams, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976).
 
 
 20
 In Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court held that under extreme circumstances a defendant may be compelled to stand trial while gagged and shackled. Id. at 344, 90 S.Ct. at 1061. The Court recognized that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant," id., but nonetheless concluded that the practice "might possibly be the fairest and most reasonable way" to handle a very contumacious defendant. Id. In Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126, the Court explained that the physical restraints suggested in Allen would be appropriate because of a substantial need. Id. at 505, 96 S.Ct. at 1693. The Williams Court observed that a state cannot compel an accused to wear jail clothing at trial because that practice furthers no state policy, id., and burdens the presumption of innocence, which is "a basic component of a fair trial under our system of criminal justice." Id. at 503, 96 S.Ct. at 1692.
 
 
 21
 To find an anonymous jury unconstitutional in the circumstances of this case would contravene the plain implication of United States v. Barnes, 604 F.2d 121 (2d Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), in which we upheld the practice. In Barnes, a massive narcotics trial similar to this one, the trial judge refused to question potential jurors about their names, residences or ethnic backgrounds. On appeal, defendants argued that the restrictions on voir dire denied defendants due process because they prevented an intelligent exercise of peremptory challenges. The Barnes majority recognized the need for sufficient information upon which to base the exercise of both peremptory challenges and challenges for cause. Id. at 142. Yet, it concluded that the jurors' demeanor and their responses to the questions posed regarding family, education and other matters would provide counsel with substantially the same insights into the jurors' views as would knowledge of their addresses and ethnic backgrounds. Id. On the peremptory challenge issue Barnes observed that the "law as to jury selection is not so unbending that it cannot ... be accommodated to the realities of modern day trials in large narcotics cases which have created such problems for the courts in large cities." Id. at 142-143 (footnote omitted).
 
 
 22
 Although the Barnes majority focused its discussion on the jury selection issue, it implicitly found an anonymous jury constitutional. Responding to defendants' argument that jurors must publicly disclose their identities, the panel said that such "is not the law--and should not be." Id. at 140. Noting the risks posed by "multi-defendant narcotics cases tried in the Southern District," id. at 134, the Barnes court considered an anonymous jury a necessary precaution to save the jurors from a fear of retaliation that could affect their deliberations. Id. at 140-41.
 
 
 23
 This and other circuits, moreover, have upheld the practice of not revealing personal information about witnesses. See United States v. Watson, 599 F.2d 1149, 1157 (2d Cir.) (occupation of participant in Witness Protection Program concealed), modified, 690 F.2d 15 (2d Cir.1979), modified sub nom. United States v. Muse, 633 F.2d 1041 (2d Cir.1980) (en banc), cert. denied, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981); United States v. Cavallaro, 553 F.2d 300, 304 (2d Cir.1977) (address of witness concealed); United States v. Varella, 692 F.2d 1352, 1355 (11th Cir.1982) (upholding Government's objections during testimony to disclosure of names, addresses, and occupations of two government witnesses), cert. denied, --- U.S. ----, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983). Although most attacks on this practice have been on Sixth Amendment grounds, concealment of a witness's identity probably affects the jurors' opinion of a defendant, and thereby implicates Fifth Amendment due process, in much the same way as would a judge's instructions to jurors not to reveal their own names. We therefore conclude that although the presumption of innocence is of significant importance, and is protected by the due process clause of the Fifth Amendment, there is no per se rule that it may not be burdened.
 
 
 24
 Unlike having an accused wear jail garb, protection of jurors is vital to the functioning of the criminal justice system. As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.
 
 
 25
 The circumstances of this case support the trial judge's decision to impanel an anonymous jury. The defendants were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several "mob-style" killings. Charges in the indictment accused defendants of attempts to interfere with the judicial process by murdering government witnesses. The trial judge examined the specific facts of this case, received evidence and arguments, and determined that the jury deserved protection. He gave the jury an intelligent, reasonable and believable explanation for his actions that did not cast defendants in an unfavorable light. The significance of this reasoned explanation by the trial court is that it minimized the potential for prejudice to defendants.[1] Upon balancing the government's interest in safeguarding jurors with the defendant's interest in avoiding erosion of the presumption of innocence, the scale in this case tips in the government's favor.
 
 
 26
 Nevertheless, we do not mean to say that the practice of impanelling an anonymous jury is constitutional in all cases. As should be clear from the above analysis, there must be, first, strong reason to believe that the jury needs protection and, second, reasonable precaution must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants. Here, there was strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors. The evidence before the trial court reasonably supported the trial judge's conclusion that precautionary measures were warranted; a trial within a trial to determine whether the alleged wrongdoing could be proven to have occurred was not required. Moreover, the explanation that jurors were not to reveal their names to protect them from the press substantially avoided any risk of aspersions on the defendants. Although advising jurors not to reveal their identities touches on sensitive individual rights, in this particular case the instruction accords with principle and common sense.
 
 III. THE SEARCH AND SEIZURE CLAIMS
 
 27
 At trial the government presented the testimony of over 121 witnesses--seven of whom were accomplices, including Nicky Barnes and Walter Centano--evidence derived from nine undercover investigations conducted over a seven-year period, 27 audio and video recordings, the fruits of various searches over a nine-year period, including over 40 drug exhibits, and hundreds of business and narcotics records. Two of the searches that produced this evidence were of defendant Wheelings' apartment and of defendant Thomas' apartment.
 
 
 28
 Wheelings' Bronx apartment was searched pursuant to a warrant that authorized a search for "narcotics and financial records, quantities of heroin traces, and other evidence." The issuing magistrate found probable cause based on an affidavit furnished by a Drug Enforcement Administration (DEA) agent. It was claimed that probable cause existed in part because of a "canine sniff" outside Wheelings' apartment that indicated the presence of narcotics inside. The underlying affidavit also stated that Wheelings had been identified by a reliable informant as a narcotics dealer and the operator of several narcotics processing mills and that when arrested the previous day, he had quickly closed the door of his apartment behind him in a suspicious manner, indicating the existence inside of contraband. The search of Wheelings' apartment yielded papers pertaining to auto registration, insurance, taxes and the like. One bullet proof vest was found. No narcotics were discovered.
 
 A. Wheelings' Claim
 1. Probable Cause From the Canine Sniff
 
 29
 Defendant Wheelings claims that the evidence seized at his Bronx apartment should have been suppressed. He argues that the canine sniff, upon which the magistrate relied in part, was an illegal search and that therefore the search warrant was not based on untainted probable cause. We first address the claim that the canine sniff constituted an illegal search. The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Canine sniffs are recognized as being less intrusive than a typical search used to determine the presence of contraband, and the practice of using trained dogs to sniff baggage at airports has been held not to constitute a search. See United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 2644-45, 77 L.Ed.2d 110 (1983); United States v. Waltzer, 682 F.2d 370, 373 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); United States v. Bronstein, 521 F.2d 459, 463 (2d Cir.1975), cert. denied, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976).
 
 
 30
 It is one thing to say that a sniff in an airport is not a search, but quite another to say that a sniff can never be a search. The question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). While one generally has an expectation of privacy in the contents of personal luggage, this expectation is much diminished when the luggage is in the custody of an air carrier at a public airport.
 
 
 31
 We have recognized the heightened privacy interest that an individual has in his dwelling place. For example, in United States v. Taborda, 635 F.2d 131 (2d Cir.1980), we found that police use of a telescope to identify objects or activities unable to be identified without it was a "search" and that, absent a search warrant, the observations could not form the basis for the issuance of a warrant. Id. at 139-40. We stated that "[t]he very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to respect his privacy." Id. at 138; see also United States v. Bonfiglio, 713 F.2d 932, 937 (2d Cir.1983) ("it was not the enhancement of the senses per se that was held unlawful in Taborda, but the warrantless invasion of the right to privacy in the home"). In United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the Supreme Court recently held that police use of an electronic "beeper" to track the defendants movements was not a "search" within the contemplation of the Fourth Amendment. Id. at 1087. But the Court specifically found that the police had not used the beeper to track defendant's activities within his home, so that the "traditional expectation of privacy within a dwelling place," id. at 1085, was undisturbed.
 
 
 32
 Thus, a practice that is not intrusive in a public airport may be intrusive when employed at a person's home. Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics, see United States v. Place, 103 S.Ct. at 2644, it remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument. Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation. The Supreme Court in Place found only "that the particular course of investigation that the agents intended to pursue here--exposure of respondent's luggage, which was located in a public place, to a trained canine--did not constitute a 'search' within the meaning of the Fourth Amendment." Place, 103 S.Ct. at 2644-45. Because of defendant Wheelings' heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search. As the agent had no warrant, the search violated the Fourth Amendment. Hence, we conclude that the information gathered from the dog's alert may not properly be used to support the issuance of the search warrant of Wheelings' apartment.
 
 2. Probable Cause Without the Canine Sniff
 
 33
 To have the evidence seized pursuant to the search warrant suppressed, Wheelings must further show that there was not a sufficient residue of probable cause to support the warrant, without considering the improper sniff, and that the agent who conducted the search did not reasonably rely on the warrant. See United States v. Leon, --- U.S. ----, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 34
 In addition to the positive sniff, the affidavit before the magistrate included the following information about defendant Wheelings: (1) upon being notified that DEA agents were there to arrest him, Wheelings quickly slipped through his apartment door and closed it so that the agents had no chance to enter; (2) a confidential informant whose reliability was established and much of whose information was corroborated, observed Wheelings processing and repackaging heroin between September and October of 1976; (3) this same informant also observed heroin being processed and repackaged for distribution between June and December of 1980 in a "mill" that was controlled by Wheelings and Walter Centano; (4) the informant personally observed another heroin mill in operation for four months in early 1981 and stated that Wheelings also jointly controlled this mill; (5) another agent stated in an affidavit: "Based on the information set forth in Exhibit B hereto [informant's information] indicating that Wheelings is a major heroin dealer, there is probable cause to believe that narcotics are presently being secreted in the apartment." The agent further stated, based on his 13 years experience as a DEA agent, that the premises described, including Wheelings' apartment, were occupied by high-ranking members of a massive narcotics organization, and that such narcotics traffickers invariably maintained financial records and other evidence of their narcotics trafficking at their residence.
 
 
 35
 Probable cause to believe certain items will be found in a specific location is a "practical, nontechnical conception," see Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), that need not be based on direct, first-hand, or "hard" evidence. Nonetheless, there must be enough evidence reasonably to believe that evidence of illegal activity will be present at the specific time and place of the search. See Sgro v. United States, 287 U.S. 206, 210-11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time"); United States v. Beltempo, 675 F.2d 472, 478 (2d Cir.), cert. denied, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982) ("The inquiry with respect to probable cause in the case of an observation of an isolated incident should focus on all of the relevant circumstances, including the element of time lapse"). Here, the informant did not say that any of the illegal activity that he observed had taken place at Wheelings' apartment. Nor did he indicate that there was a heroin mill in operation at the time the search warrant was issued. The warrant to search Wheelings' apartment was issued on March 10, 1983 and the most recent heroin operation with which the informant connected Wheelings was in the first four months of 1981. Thus, the evidence before the magistrate of Wheelings' participation in illegal activity was two years old. Even though courts should avoid "[a]dopting an arbitrary 'cut-off' expressed in days or weeks beyond which probable cause ceases to exist," Beltempo, 675 F.2d at 478, two-year-old evidence of participation in a heroin mill, not at the dwelling to be searched, is stale and cannot support a search warrant. Wheelings' suspicious entry into his apartment is not enough alone to establish probable cause to search that apartment without some evidence that he was involved in illegal activity at that time.
 
 
 36
 A determination of whether probable cause existed must be made by us independently, as the deference usually accorded to a magistrate's finding of probable cause, see Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); United States v. Travisano, 724 F.2d 341, 345 (2d Cir.1983), is not appropriate when the magistrate relied in part on improper information. We cannot find that the "totality of the circumstances," Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)--apart from the dog's alert--provided a sufficient basis for the issuance of a search warrant.
 
 
 37
 This does not end our inquiry. We must consider whether the agent who conducted the search acted in good faith reliance on the search warrant. The Supreme Court recently stated in United States v. Leon:
 
 
 38
 [A]ssuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.
 
 
 39
 104 S.Ct. at 3419. The DEA agent brought his evidence, including the positive "alert" from the canine, to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause; it was reasonable for the officer to rely on this determination. The Leon Court announced a "good faith" exception to the exclusionary rule, and we find that the exception applies to this case. Thus, the district court correctly refused to suppress the evidence seized at defendant Wheelings' apartment.
 
 B. Thomas' Claim
 
 40
 In March 1976 Kenneth Thomas was arrested in the hall outside of his apartment by four police officers with drawn guns. The police then searched Thomas' apartment and discovered large quantities of cash and a briefcase containing several hundred rounds of ammunition. The government claims the warrantless search was proper because it was incident to an arrest, Thomas consented, and it was justified by exigent circuimstances. The government also claims, and the trial judge found, that Thomas waived his right to move to suppress this evidence because he did not move for such relief before trial. Thomas claims that he did not make such a motion prior to trial because prior to the cross-examination of one of the arresting officers there was no evidence available to defense counsel on which to base an application to suppress. Appellant claims that he was unable to remember the details of his seven-year-old arrest and that prior to hearing the arresting officer's testimony he believed he had been arrested inside his apartment.
 
 
 41
 Motions to suppress are governed by Fed.R.Crim.P. 12(b) and 12(f). Rule 12(b)(3) requires counsel to raise motions to suppress before trial. According to Rule 12(f), failure timely to raise defenses, objections, or requests that must be made before trial constitutes their waiver. Relief from waiver may be granted in the sound discretion of the trial judge. See United States v. Mauro, 507 F.2d 802, 805-07 (2d Cir.), cert. denied, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975). Judge Pollack's refusal to grant Thomas relief from his waiver was not an abuse of discretion. Thomas knew that the search was warrantless and had arguably gone beyond that allowed incident to arrest (not all items seized were in plain view). The trial court could have found that Thomas had enough information before trial upon which to base an objection to admission of the evidence. Judge Pollack might also have properly reasoned that Thomas should have sought information about the search prior to trial, instead of waiting to cross-examine the arresting officer. For these reasons we decline to disturb the denial of Thomas' motion to suppress.
 
 
 42
 IV. TRIAL CONDUCTED ON MUHAMMED'S SABBATH DAY
 
 
 43
 Ishmael Muhammed claims that the district court's decision to conduct trial on Fridays violated his First Amendment right to the free exercise of religion. Muhammed--a Muslim, who observes his Sabbath from sundown on Thursday to sundown on Friday--requested that his trial not be conducted on Fridays. In a memorandum opinion dated October 4, 1983 Judge Pollack denied that request. See United States v. Fisher, 571 F.Supp. 1236 (S.D.N.Y.1983). Muhammed did not appeal this decision, and attended the Friday sessions of his trial. As the trial is complete, reversal of his conviction would not remedy the claimed infringement of defendant's rights and this issue is therefore inappropriately raised on this appeal.
 
 
 44
 The time for Muhammed to have appealed the decision to hold trial on Fridays was immediately after the trial court entered its order. Although, as the Supreme Court recently stated in Flanagan v. United States, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), the "collateral order" exception to the final judgment rule is very narrow, id. at 1055, that exception would allow an appeal on an issue such as this. For an interlocutory order of a trial court to be reviewable it must satisfy three conditions: it must "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (footnote omitted). Judge Pollack's order conclusively determined that trial would be held on the defendant's sabbath. The question of this practice's interference with Muhammed's First Amendment rights was completely separate from the merits of the criminal trial. And, as noted, since there is no relief that this Court may grant upon appeal of Muhammed's criminal conviction that would protect his claimed right not to have the trial that he attended held on Fridays, the matter is effectively unreviewable on appeal from a final judgment. See State of New Jersey v. Chesimard, 555 F.2d 63, 78 (3d Cir.1977) (en banc) (Gibbons, J., dissenting) ("If the free exercise right in question is lost pendente lite it is lost for all time"). Therefore, Muhammed should have taken a collateral appeal from the district court's order of October 4, 1983. There is nothing that we can do now.
 
 V. CUMULATIVE SENTENCES
 
 45
 Appellants Wheelings, Forman and Morris all argue that the trial judge erred by imposing cumulative sentences for their convictions. Wheelings was convicted under 21 U.S.C. Sec. 846 for conspiring to violate the narcotics laws, under 18 U.S.C. Sec. 1962(d) for conspiring to violate the Racketeering laws, and under 18 U.S.C. Sec. 1962(c) for operating a Racketeering enterprise. He was sentenced respectively to 15 years and a $25,000 fine, 15 years and a $12,500 fine and 20 years and a $12,500 fine, all sentences to run consecutively (50 years) and a total fine of $50,000. Forman was also convicted of violating both Sec. 846 and Sec. 1962(d). He was sentenced respectively to 15 years and $25,000 and 20 years and $12,500, the sentences to run consecutively and a total fine of $37,500. Morris was convicted of violating Sec. 846 and was sentenced to 15 years to run concurrently with a 15-year sentence for violation of 21 U.S.C. Sec. 841(a)(1), a heroin distribution charge. Those concurrent sentences were to run consecutively with a one-year sentence for violation of 18 U.S.C. Sec. 924(c)(2), a firearms offense, a 15-year sentence for violation of 18 U.S.C. Sec. 1962(d), and a 20-year sentence for violation of 18 U.S.C. Sec. 1962(c). Morris' total sentence was for 51 years. Morris was also fined $25,000 for each of the first two convictions, but those fines were combined to total only $25,000. A $12,500 fine was added for the RICO conspiracy conviction and a $12,500 fine for operating a racketeering enterprise. Total fines were $50,000.
 
 
 46
 Wheelings' and Morris' argument against the cumulative sentences for 18 U.S.C. Sec. 1962(c) and (d) is without merit. Recently in United States v. Bagaric, 706 F.2d 42 (2d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), we held that "the plain language and different elements of Sec. 1962(c) and Sec. 1962(d), combined with the absence of evidence of a contrary legislative intention, support the imposition of consecutive sentences for violation of both subsections." Id. at 63-64 n. 18 (citations omitted). The more difficult question is whether cumulative sentencing is appropriate for violations of 18 U.S.C. Sec. 1962(d) and 21 U.S.C. Sec. 846. We find that it is.
 
 
 47
 Cumulative punishment is forbidden if Congress did not aim to punish each statutory violation separately. See Albernaz v. United States, 450 U.S. 333, 338-340, 101 S.Ct. 1137, 1142-1143, 67 L.Ed.2d 275 (1981); see also Jeffers v. United States, 432 U.S. 137, 155-58, 97 S.Ct. 2207, 2218-20, 53 L.Ed.2d 168 (1977) (Congress did not intend to punish violations of 21 U.S.C. Sec. 848 and 21 U.S.C. Sec. 846 separately, therefore cumulative punishment for the two offenses was inappropriate). In United States v. Barton, 647 F.2d 224 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), we held that Congress did intend to allow cumulative punishment for violations of 18 U.S.C. Sec. 1962(d), the RICO conspiracy section, and 18 U.S.C. Sec. 371, the general conspiracy section. We explained in Barton that "Congress's express purpose in enacting the Organized Crime Control Act, of which RICO was Title IX ... was to provide increased penalties for racketeering activity." 647 F.2d at 237 (emphasis in original). Therefore, "[t]o hold that cumulative sentences could not be imposed [for violations of Sec. 371 and Sec. 1962(d) ] would plainly defeat Congress's intention to enhance the penalties imposed on those who conspire to engage in racketeering." Id. at 238.
 
 
 48
 The same analysis applies to 21 U.S.C. Sec. 846, the section on conspiracy to violate narcotics laws. The Report of the House of Representatives Interstate and Foreign Commerce Committee on the Comprehensive Drug Abuse Prevention and Control Act of 1970 states that "[t]he illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive." H.R.Rep. No. 1444, 91st Cong., 2d Sess. 116, reprinted in 1970 U.S.Code Cong. & Ad.News 4566, 4575. Thus, Congress intended to impose more severe penalties on those who conspire to violate narcotics laws. Although it is clear that both 18 U.S.C. Sec. 1962(d) and 21 U.S.C. Sec. 846 are intended to enhance the penalties for violation of the general conspiracy provision found in 18 U.S.C. Sec. 371, it can be argued that it stretches matters too far to allow these already increased punishments to enhance each other, and that Congress could not have intended such a result.
 
 
 49
 To determine whether it was the aim of Congress to have multiple punishments for conduct that violates two statutory provisions, we first look to the language of the provisions. "If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision." United States v. Marrale, 695 F.2d 658, 662 (2d Cir.1982), cert. denied, 460 U.S. 1041, 103 S.Ct. 1434, 75 L.Ed.2d 793 (1983). Here, the two sections are in separate statutes and are intended to deter two different kinds of activity: racketeering on the one hand and narcotics violations on the other. Each statute unequivocally authorizes punishment for violation of its conspiracy provisions, that is, 18 U.S.C. Sec. 1963(a) provides a maximum fine of $25,000 and a maximum sentence of 20 years for violation of any provision of Sec. 1962 (the conspiracy section of RICO), and 21 U.S.C. Sec. 846 provides for punishment not to "exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."
 
 
 50
 In order to ascertain whether the offenses in question are in fact separate, see Albernaz, 450 U.S. at 337-39, 101 S.Ct. at 1141-42 (1981); Marrale, 695 F.2d at 662, we turn to the test set forth in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):
 
 
 51
 The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 52
 Id. at 304, 52 S.Ct. at 182. As it is Congressional purpose that we are analyzing, it is necessary to examine the statutory language in general, not the specific allegations made in this case. See Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975). A Section 1962(d) conspiracy requires proof of the existence of an "enterprise" engaged in a "pattern of racketeering activity"; a Section 846 conspiracy does not. Section 846 requires proof of a narcotics related conspiracy; a RICO conspiracy charge is satisfied by proof of an agreement to commit a felony, no proof of conspiracy to commit narcotics violations is necessary. Thus, each offense requires proof of a fact that the other does not, and the Blockburger test is satisfied. See also United States v. Solano, 605 F.2d 1141, 1145 (9th Cir.1979), cert. denied, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980) (denying motion to dismiss RICO conspiracy charge that involved a drug conspiracy on which defendant was previously convicted on grounds that RICO conspiracy and Sec. 846 conspiracy are separate offenses). From this we conclude that it was Congress' purpose to impose multiple punishment for these two separate offenses.
 
 
 53
 Finally, we look to the legislative history to see if there is any indication to the contrary. "If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments." Marrale, 695 F.2d at 662. An examination of the legislative histories of 18 U.S.C. Sec. 1962(d) and 21 U.S.C. Sec. 846 reveals that nothing was said concerning the relationship between the two sections. In light of the separateness of the offenses under Blockburger and the lack of legislative history suggesting a contrary purpose, we find that cumulative punishments for those convicted of a Sec. 846 narcotics conspiracy and a Sec. 1962(d) RICO conspiracy is proper.
 
 VI. CONCLUSION
 
 54
 Accordingly, the judgments appealed from are affirmed.
 
 
 55
 JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 56
 I concur in all of Judge Cardamone's well-reasoned opinion affirming the convictions and the sentences, except that portion that upholds the imposition of cumulative sentences upon appellants Forman, Morris, and Wheelings for a narcotics conspiracy in violation of 21 U.S.C. Sec. 846 (Count 1) and a RICO conspiracy in violation of 18 U.S.C. Sec. 1962(d) (Count 13). As the following analysis endeavors to show, the narcotics conspiracy alleged in the indictment was a lesser included offense within the RICO conspiracy. I therefore respectfully dissent from that portion of the judgment upholding the cumulative sentences of these appellants on Counts 1 and 13 because, even assuming that Congress has the power to authorize cumulative punishments for greater and lesser included offenses, I see no basis for thinking it has done so in the circumstances of this case.
 
 
 57
 I start, like the majority, by inquiring whether the section 846 narcotics conspiracy and the section 1962(d) RICO conspiracy are separate offenses. And I agree that the test to be applied, in the familiar language of Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), is "whether each provision requires proof of a fact which the other does not." But as the Ninth Circuit has cautioned, "Although such a test appears easily applicable to most cases involving double jeopardy claims, it is not easily applied to complex conspiracy prosecutions." United States v. Solano, 605 F.2d 1141, 1144 (9th Cir.1979), cert. denied, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980).
 
 
 58
 Before applying the Blockburger "test" to sections 846 and 1962(d), it is important to recall the circumstances of that case, lest we commit the error of enlisting a venerable precedent into service it was not designed to perform. The provisions involved in Blockburger were sections 1 and 2 of the Harrison Narcotic Act, ch. 1, 38 Stat. 785, 786 (1914), amended by ch. 18, Sec. 1006, 40 Stat. 1057, 1131 (1919) (successor statute repealed 1970), which made it a crime to distribute narcotics "except in the original stamped package" (Sec. 1) and "except in pursuance of a written order" (Sec. 2). A distribution in the absence of the original stamped package and a distribution in the absence of a written order form were the only two activities prohibited by these provisions. In that context it is perfectly clear how the Court could so readily conclude that each provision required proof of a fact that the other provision did not.
 
 
 59
 There can be no doubt that section 1962(d) requires proof of a fact not required for conviction under section 846--namely, the existence of an "enterprise" engaged in a "pattern of racketeering activity," see 18 U.S.C. Sec. 1962(c) (defining the substantive offense that section 1962(d) punishes a conspiracy to commit). However, when we inquire whether section 846 requires proof of a fact not required for conviction under section 1962(d), we must be careful to recognize that section 1962(d), unlike the narrow provisions involved in Blockburger, punishes a wide variety of diverse conduct. The range results from the assortment of criminal acts comprehended in the definition of "racketeering activity" in section 1961(1), two acts of which are required to constitute the "pattern of racketeering activity" defined in section 1961(5) and required for conviction of a RICO offense. There are many provisions in the definitional section of RICO that specify facts not required for conviction under section 846. The Government has artfully selected a very good example, the provision of section 1961(1)(A) that defines "racketeering activity" to include murder in violation of state law, when it argues that "while proof of an agreement to commit at least two predicate acts--e.g. murder--suffices to establish the 'pattern of racketeering activity' required under section 1962(d), proof of such acts was neither necessary, nor would it have sufficed to prove a section 846 narcotics conspiracy." Brief for Appellee at 149.
 
 
 60
 However, another provision of the definitional section specifies a fact that is required for conviction under section 846: Section 1961(1)(D) includes a provision that defines racketeering activity as "dealing in narcotic or other dangerous drugs, punishable under any law of the United States." When that provision is invoked to punish racketeering activity charged as an object of a conspiracy in violation of section 1962(d), then a conspiracy in violation of section 846 might not be a separate offense. On the contrary, it might well be a lesser included offense, depending on the circumstances of a particular case, since the agreement, the objective of dealing in narcotics, and the wrongful intent, all of which are required for conviction under section 846, are also required for conviction of a section 1962(d) conspiracy that has as its object a pattern of racketeering activity as defined in the "narcotics dealing" provision of section 1961(1)(D).
 
 
 61
 The issue would be in sharp focus if section 1962(d), instead of being a single provision, were divided into a series of separately numbered provisions, each corresponding to the various acts of racketeering activity included in the broad definition in section 1961(1). In that event, the "provision" punishing a RICO conspiracy to distribute narcotics would obviously include the offense punished by section 846. But it should be just as obvious that application of the Blockburger test cannot turn on whether provisions of a statute are separately numbered or, as in the case of section 1962(d), collected under one number in a provision that incorporates many provisions contained elsewhere, such as the definitional provisions in section 1961(1).
 
 
 62
 Thus far, I have tried to demonstrate only that a section 846 narcotics conspiracy can be a lesser included offense within a section 1962(d) RICO conspiracy to commit racketeering activity defined in section 1961(1)(D) to include dealing in narcotics. Whether the section 846 conspiracy alleged in this case is lesser included within the section 1962(d) conspiracy requires further consideration. The majority maintains that the Blockburger test is to be applied solely by analyzing "the statutory language in general, not the specific allegations made in this case." 757 F.2d at 1371. Reliance is placed on footnote 17 in Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975), presumably the language stating, "As Blockburger and other decisions applying its principle reveal, ... the Court's application of the test focuses on the statutory elements of the offense." Id. (citations omitted). I think that further analysis will demonstrate that the Iannelli footnote, in referring to the "focus[ ]" of the inquiry, is describing how the first step in applying the Blockburger test should be taken, not how the test is finally to be applied in all cases.
 
 
 63
 In Blockburger, focusing on the elements of the offense was the beginning and, properly, the end of the inquiry. Each of the narrowly drawn provisions in that case always required proof of a fact that the other did not; therefore, further consideration of the allegations in the particular case was unnecessary to conclude that separate offenses were inevitably present. However, the Supreme Court has specifically recognized that, where a statutory offense that can be committed in a variety of ways is claimed to be the same as some other statutory offense, the Blockburger test cannot be applied only by analyzing the statutory elements but requires further consideration of the precise allegations. In Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Court favorably recalled its earlier discussion in In re Nielsen, 131 U.S. 176, 190, 9 S.Ct. 672, 677, 33 L.Ed. 118 (1889), especially the passage approving a New Jersey Supreme Court decision that had held that "a conviction for arson barred a subsequent felony-murder indictment based on the death of a man killed in the fire." Brown v. Ohio, supra, 432 U.S. at 168, 97 S.Ct. at 2226 (citing State v. Cooper, 13 N.J.L. 361 (1833)). The felony-murder statute could have been violated by a variety of conduct other than arson. If only the elements of the offenses had been compared, there would have been different offenses for purposes of double jeopardy, since the arson statute required an element not required for felony murder. But in the New Jersey case the felony-murder offense included the arson offense because the particular felony-murder offense alleged was the arson that resulted in the victim's death. The sweep of the felony-murder statute, like the sweep of the RICO statute, required more than analysis of the statutory elements; it required analysis of the specific allegations in the case.
 
 
 64
 We followed the same approach in United States v. Barton, 647 F.2d 224 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). In examining whether separate offenses were defined by the general conspiracy statute, 18 U.S.C. Sec. 371, and the RICO conspiracy statute, 18 U.S.C. Sec. 1962(d), we began by noticing some obvious differences between the statutes: Section 1962(d), but not section 371, requires, as an object of the conspiracy, a pattern of racketeering activity; section 371, but not section 1962(d), requires proof of an overt act. Id. at 236-37. However, rather than end the analysis at that point, we went on to point out the difference between the allegations made in that case: The section 371 conspiracy was an agreement to possess explosive devices; the section 1962(d) conspiracy was an agreement to threaten arson and murder. Id. at 237. I do not agree with the majority when it reads Barton, which I joined, to hold that cumulative punishments may be imposed for section 371 and section 1962(d) conspiracies, without regard to the particular allegations involved. We upheld cumulative penalties in Barton, because, as we said, we were "convinced that Sec. 371 and Sec. 1962(d) created--and Counts One and Thirteen charged--two separate offenses." Id. (emphasis added). Nothing in Barton suggested that cumulative penalties could have been imposed if the section 371 conspiracy had been a lesser included offense within the RICO conspiracy.
 
 
 65
 Similarly, in United States v. Solano, supra, in permitting trial to proceed on a count charging a violation of section 1962(d), despite a prior conviction for violating section 846, the Ninth Circuit merely held that a subsequent prosecution for violating section 1962(d) was not necessarily barred by the Double Jeopardy Clause, especially in light of the Government's claim that its proof would show a RICO conspiracy that differed significantly from the narcotics conspiracy. 605 F.2d at 1144. But the Ninth Circuit emphasized that a final decision on the merits of the jeopardy claim could not be made until the trial unfolded and that the defendant would be free to renew his jeopardy claim if convicted on the RICO count. Id. at 1145.
 
 
 66
 Thus, in this case we cannot simply compare the statutes, but we must also examine the allegations made and proved. Count 13 charged the defendants, including Forman, Morris, and Wheelings, with a RICO conspiracy, in the Southern District of New York and elsewhere from 1972 until the date of the indictment, March 17, 1983, that had as its object "making money in illegal trafficking in narcotics and other dangerous drugs." Also pertinent are the predicate crimes constituting the acts of racketeering activity in which each defendant was accused of participating, since "to convict on a RICO conspiracy [the prosecution] must prove that defendant himself at least agreed to commit two or more predicate crimes." United States v. Ruggiero, 726 F.2d 913, 921 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). The predicate crimes alleged against Forman, Morris, and Wheelings were several narcotics transactions and several actual or attempted murders. Count 1 charged the defendants, including Forman, Morris, and Wheelings, with a section 846 conspiracy, in the Southern District of New York and elsewhere from January 1, 1972, until the date of the indictment, that had as its object the distribution of heroin and cocaine. Of the 32 acts of racketeering alleged against either Forman, Morris, or Wheelings in the RICO conspiracy, 27 were alleged against them as overt acts in furtherance of the section 846 conspiracy--17 narcotics transactions and 10 actual or attempted murders.
 
 
 67
 Thus, there was not simply "a substantial overlap in the proof," Iannelli v. United States, supra, 420 U.S. at 785 n. 17, 95 S.Ct. at 1293 n. 17, but virtual identity of the allegations of Counts 1 and 13, and also of the proof presented to secure convictions on these counts. Nor is this a situation like that in Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), where a single criminal agreement warranted cumulative sentences because the agreement had two distinct objectives, marijuana distribution and marijuana importation, and a conspiracy to achieve each objective violated separate statutes, 21 U.S.C. Sec. 846 (1976) and 21 U.S.C. Sec. 963 (1976). The conspiracies alleged in this case in Counts 1 and 13 did not have distinct objectives; the object of each was dealing in narcotics. The RICO conspiracy had a slightly larger objective than the section 846 conspiracy only because the RICO conspiracy alleged a pattern of racketeering activity and the section 846 conspiracy did not. However, and this is the critical point, the section 846 conspiracy alleged in Count 1 did not require proof of any fact that was not required to be proven to establish the RICO conspiracy alleged in Count 13. Neither the Government's brief nor the majority's opinion even purports to identify any additional fact required to convict on Count 1 but not on Count 13. I therefore conclude that in this case the section 846 conspiracy is a lesser included offense within the section 1962(d) conspiracy.
 
 
 68
 Since Forman, Morris, and Wheelings were convicted of greater and lesser included offenses, I must consider whether Congress has authorized cumulative punishments for such offenses when they are committed in violation of section 846 and 1962(d). Though I find no decision upholding the authority of Congress to impose cumulative punishments for greater and lesser included offenses, I recognize the possibility that the Supreme Court's statement in Albernaz v. United States, supra, 450 U.S. at 344, 101 S.Ct. at 1145 (footnote omitted)--"Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution"--may extend even to imposition of multiple punishments for greater and lesser included offenses. But see Jeffers v. United States, 432 U.S. 137, 155, 97 S.Ct. 2207, 2218, 53 L.Ed.2d 168 (1977) (plurality opinion) ("If some possibility exists that the two statutory offenses are the 'same offense' for double jeopardy purposes, however, it is necessary to examine the problem closely, in order to avoid constitutional multiple-punishment difficulties.")
 
 
 69
 As a matter of plausible intention, it can be argued that the Congress that intended to increase the maximum penalty for a RICO conspiracy from the five years that would have been available under the general conspiracy statute, 18 U.S.C. Sec. 371, to the twenty years authorized by 18 U.S.C. Sec. 1963 would not have been distressed to see that twenty-year maximum added on to whatever penalty is authorized for an offense that is lesser included within the RICO conspiracy. On the other hand, though that Congress intended to authorize an enhanced penalty for a RICO conspiracy, it obviously did not go nearly as far as it might have when it set the maximum penalty at twenty years. And that Congress understood that a RICO conspiracy, like the one charged in Count 13 in this case, could involve murder, a state offense specifically listed in the definition of racketeering activity, 18 U.S.C. Sec. 1961(1)(A). Congress has also made clear that it wants heavy penalties authorized for narcotics activity, but that sentiment alone does not justify an inference that Congress intended to authorize cumulative penalties for a RICO narcotics conspiracy and a lesser included non-RICO narcotics conspiracy. For organized narcotics activity, Congress has already enhanced the penalty for conspiracy from the five years authorized by 18 U.S.C. Sec. 371 to the fifteen years authorized by 21 U.S.C. Secs. 841(b)(1)(A), 846 and to the thirty years for a second offender, id., and also provided a maximum sentence of life imprisonment for those convicted of engaging in a continuing criminal narcotics enterprise, 21 U.S.C. Sec. 848(a). While this array of penalties demonstrates that Congress is intent on authorizing substantial penalties, it also indicates that Congress has been precise in setting different maximums for different degrees of involvement in narcotics activity. The precision of the congressional scheme would be distorted if cumulative penalties could be imposed whenever a section 846 narcotics conspiracy is a lesser included offense within a RICO narcotics conspiracy.
 
 
 70
 For these reasons, I conclude that it was impermissible to impose cumulative sentences upon Forman, Morris, and Wheelings with respect to Counts 1 and 13. I would vacate the sentences of these defendants on these counts and remand to permit Judge Pollack to impose an appropriate sentence on Count 13, the greater of the two offenses, up to the maximum of 20 years imprisonment and a fine of $25,000. See McClain v. United States, 643 F.2d 911 (2d Cir.) (remand for resentencing when less than maximum sentence imposed and sentence on another count improperly added), cert. denied, 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424 (1981). It is obviously not sympathy for these defendants, who have committed outrageous crimes, that prompts me to dissent on this aspect of the case. I do so only because even the most heinous criminals may not be sentenced beyond the limits of the law.
 
 
 71
 DAVIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 72
 I concur in all of Judge Cardamone's opinion except that I do not agree with the strong implication (if not outright statement) that a canine sniff outside a dwelling can never be considered by a magistrate in support of a proposed search warrant. In this instance I fully agree that the magistrate should not have taken account of the sniff (in support of the requested warrant) because the other evidence of probable cause was far too thin or too stale. But I can envisage other circumstances in which a sniff might well be considered by the magistrate--along with other, stronger evidence of probable cause--and I would leave that problem open.
 
 
 
 *
 Honorable Oscar H. Davis, Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Judge Pollack instructed the prospective jurors as follows:
 Now, this should be a very interesting case. Undoubtedly, it could receive considerable publicity, newspaper, radio and television. The media and the public may be curious concerning the identity of the participants, the witnesses, the lawyers and the jurors. That curiosity and its resultant comments might come to the attention of the jury selected here and possibly impair its impartiality by viewpoints expressed, comments made, opinions, inquiries and so forth.
 Now, such outside influences could tend to distort what goes on in court, the evidence, and be distracting and divert the attention of the jury, and it might result in people prying into personal affairs of the participants, including those selected as jurors, who are selected only to judge the evidence in the case that can legally come before you, and thus to distort and distract attention from the case.
 Consequently, taking into consideration all the circumstances, I have decided that in selecting those who will serve as the jury your name, your address and your place of employment will remain anonymous during the trial of this case, and that's the reason why you have been given numbers.
 This will serve to ward off curiosity and seekers for information that might otherwise infringe on your privacy and it will aid in insulating and sheltering you from unwanted and undesirable publicity and embarrassment and notoriety and any access to you which would interfere with preserving your sworn duty to fairly, impartially and independently serve as jurors. It will permit the media complete freedom of coverage of this trial.
 For similar reasons, the jurors ultimately selected will be sequestered and kept free from outside influence and apart from the trial of the case. They will be housed and fed at government expense in a desirable hotel facility, to be kept together, and have your meals and recreation facilities all at government expense, and to be transported to and from court each day by the marshals assigned for the purpose.
 I know that this raises some thoughts about how one manages to go on this kind of vacation from your ordinary affairs. You would have your necessary changes of clothing arranged for and activities and contacts generally supervised by the marshals.
 This duty and service of the highest obligation of citizenship should be an interesting and rewarding experience, to be looked back upon with interest and pleasant recollection by those who are privileged to be selected.