**UNITED STATES of America, Plaintiff,**

v.

**Joel J. CACACE, Sr., Defendants.**

**No. 03 CR 0072(SJ).**

United States District Court, E.D. New York.

June 15, 2004.

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, By Patricia E. Notopoulous, Esq., Michael Warren, Esq., Katya Jestin, Esq., for Plaintiff.

Michael L. Macklowitz, New York City, Gino Josh Singer, New York City, for Defendant.

## MEMORANDUM AND ORDER

JOHNSON, Senior District Judge.

The United States of America ("the Government") moves for an anonymous and partially sequestered jury for the trial of Defendant Joel J. Cacace, Sr. ("Defendant"), which is scheduled to commence on September 13, 2004. For the reasons set forth below, the Government's motion is GRANTED.

## DISCUSSION

The Government contends that this case warrants partial sequestration and an anonymous jury in order to "to ensure the public's right to a fair trial by protecting the jury from interference." (Govt.'s Mem. in Supp. of Mot. for Anonymous and Partially Sequestered Jury at 2.) Specifically, the Government requests that "(a) the names, addresses and places of employment of the prospective jurors not be revealed to either the parties or their attorneys; and (b) from the time each juror survives any challenge for cause and peremptory challenges until the end of the trial, the jurors be escorted by representatives of the United States Marshal [Service] to and from the courthouse each day, and to and from the locations to which they recess for lunch, when they are not lunching in the jury room." (*Id.* at 1.)

"Sequestration is a matter committed to the sound discretion of the trial

court." *United States v. Persico*, 832 F.2d 705, 718 (2d Cir.1987). "When genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." *United States v. Thai*, 29 F.3d 785, 800 (2d Cir.1994). As stated by Judge Kennan in the district court opinion in *Persico*, "while the impaneling of an anonymous jury is frequently upheld, any application to do so must be carefully considered to protect the defendants from any risk of undue prejudice." *United States v. Persico*, 621 F.Supp. 842, 879 (S.D.N.Y.1985).

As pointed out by Plaintiff, courts have examined the following factors in determining the propriety of ordering a partially sequestered and anonymous jury: (1) the seriousness of the charges; (2) the dangerousness of the defendant; (3) the defendant's ability to interfere with the judicial process by himself or through his associates; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair. *See Thai*, 29 F.3d at 801; *United States v. Thomas*, 757 F.2d 1359, 1364–66 (2d Cir. 1985); *Persico*, 621 F.Supp. at 878.

### A. Seriousness of the Charges and the Dangerousness of Defendant

■ A review of the indictment demonstrates the serious nature of the charges and Defendant's alleged proclivity toward violence. Since the 1980s, Defendant is alleged to have been a made member of the Colombo Family. The Government contends that Defendant was a captain, a consigliere, and is currently the acting boss of the Colombo Family.

The indictment charges Defendant with the murder of Carlo Antonino ("Antonino") and George Aronwald ("G.Aronwald"). Antonino was a former New York City Police officer who allegedly provided confidential police department information to Defendant in exchange for money. The Government contends that Defendant ordered that Antonino be killed because he feared that Antonino would cooperate with the Government if he were ever arrested. The Government further contends that Defendant assigned the killing to two brothers, Eddie and Vinnie Carini ("the Carinis"), and Frank Smith ("Smith") (collectively, "hit men").

G. Aronwald was the father of former prosecutor William Aronwald ("W. Aronwald"). The Government avers that Carmine "the Snake" Persico, the alleged jailed boss of the Colombo Family, ordered that W. Aronwald and another prosecutor be killed because of the disrespect they showed to members of organized crime during previous criminal prosecutions.[1] The Government further avers that Defendant assigned the hit men to carry out the murder. In preparation for the murder, Defendant and other co-conspirators purportedly attempted to conduct surveillance at what they thought was W. Aronwald's office in Manhattan. Instead, the Government asserts that they went to the law office of G. Aronwald, who was at the time an Administrate Law Judge for the New York City Parking Violations Bureau. As a result, it is alleged that the hit men

---

1. According to the Government, at the time these orders were given, W. Aronwald was a member of the defense bar and had recently testified on behalf of the Government in the Gotti trial. W. Aronwald had previously worked as a former Manhattan Assistant District Attorney, Special Attorney for the Organized Crime Section of the Department and Chief of the Criminal Division in the United States Attorney's Office for the Eastern District of New York.

identified the wrong target and killed G. Aronwald.

Defendant is also charged with participating in the murder of Carmine Variale ("Variale") and Frank Santora (Santora"). According to the Government, following G. Aronwald's murder, the Carini brothers were murdered because of their "botched" attempt to murder W. Aronwald. In an effort to deflect suspicions away from himself, it is alleged that Defendant, who was purportedly suspected of the murders, informed Smith that Variale and Santora were responsible for the killings. The Government contends that Smith then shot Variale and Santora in retaliation.

The Government also alleges Defendant's involvement in the following violent incidents: (1) Defendant killed two organized crime associates who attempted to kidnap him; (2) Defendant was a member of Vincent "Jimmy" Angelina and Joseph Tomasello's crew, who were notorious hit men for Carmine "the Snake" Persico; and (3) Defendant had a shoot-out with Greg Scarpa, Sr. and his crew in front of Defendant's social club in Brooklyn.

Based on the foregoing, the Court finds that the seriousness of the charges and Defendant's alleged charged and past violent behavior weighs in favor of partial sequestration and anonymity of the jurors. See Thomas, 757 F.2d at 1364 (finding that impaneling an anonymous and sequestered jury was appropriate where "the defendants were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several 'mob-style' killings.")

## B. Defendant's ability and previous attempts to obstruct justice

■ The Government argues that Defendant has obstructed justice in the past and will not hesitate to do so again. Defendant counters that the Government failed to establish that Defendant has previously obstructed or attempted to obstruct justice. Rather, Defendant maintains that the Government inadequately relies on Defendant's purported high rank in the Colombo family and the fact that other members of the Colombo family have engaged in obstructing justice. The Court rejects this argument. The charged Antonino murder and the multiple counts of extortion support the Government's argument that Defendant is likely to use improper and unlawful influence to obstruct the judicial proceedings. See Persico, 621 F.Supp. at 878.[2]

Despite Defendant's protestations to the contrary, the Court also relies on the Colombo Family's reputation of utilizing bribery, obstructing justice, and jury tampering to elude convictions. The Government sets forth the following examples. In Allie Boy Persico's case, an anonymous jury was ordered because a government source "advised agents of the Federal Bureau of Investigation that a high ranking member of the Persico faction has said that efforts would be made to tamper with the jury in order to avoid a conviction." United States v. Persico, No. 92–0351, 1994 WL 150837, at *2 (E.D.N.Y. April 20, 1994). The Government alleges that Andrew Russo, a long-time Persico family associate, made efforts to contact one of the anonymous jurors in a Colombo Family war case and hid a key witness who knew of these efforts so that she would not testify in the government's investigation of this attempted tampering.

Also, if Defendant is the acting boss of the Colombo Family, as the Government

---

**2.** The Court rejects Defendant's argument minimizing the significance of the Antonino murder.

alleges, he, like Carmine "the Snake" Persico, would have the means to interfere with the judicial process. *See United States v. Amuso,* 21 F.3d 1251, 1264–5 (2d Cir.1994) (upholding the district court's decision to impanel an anonymous and sequestered jury based, in part, on the fact that the defendant was "the head of a powerful crime organization" and therefore it "was certainly reasonable to expect that [the defendant] had the means to interfere with the jurors if he so desired.").

Defendant's charged crimes, his alleged position as the acting boss of the Colombo Family, and the Colombo Family's previous attempts at obstructing justice weigh in favor of the partial sequestration and anonymity of the jury. *See Thomas,* 757 F.2d at 1365 (noting that "there was strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors").

### C. Public and Media attention

■ The Government contends that public and media attention to this case warrants anonymity. It is well known that the local media reports extensively on mob activity. The media's coverage of trials of members of organized crime, particularly when the defendant is the acting boss, is especially heightened. Following Defendant's arrest, local news media published a series of articles discussing Defendant's status as the acting boss and the charged offenses, particularly detailing the Aronwald murder.

The Government further contends that Defendant has been featured in numerous press articles regarding his relationship with Eddie Carini's widow, who Defendant purportedly married shortly after Eddie Carini's death. The Government points out that Newsday, a local newspaper, published an article which raised speculation that Defendant was responsible for Eddie Carini's death and the death of Ralph Dole, the widow's husband following her divorce from Defendant. The Government avers that these reports as well as others will no doubt surface during the trial. As a result, the Government contends that sequestering the jury is imperative to reduce the risk that the jury may be prejudiced against Defendant through exposure to press reports of the charged and uncharged murders. *See Thai,* 29 F.3d at 801 (finding that anonymity may be warranted "when there has been extensive pretrial publicity in cases involving allegations of violent conduct").

The Government maintains that such measures are necessary to: (1) prevent the press from attempting to interview jurors' family members, friends, neighbors, and co-workers; (2) prevent the press from arranging post-verdict interviews of the jurors; and (3) prevent others who learn of the jurors' identities from approaching them. After considering the Government's arguments, the Court finds that the public and press attention directed toward Defendant and this case weighs in favor of partial sequestration and anonymity of the jurors.

The Court finds that concerns about juror safety, potential tampering, and press coverage are sufficiently strong to warrant the impaneling of a partially sequestered and anonymous jury. Accordingly, the government's motion is granted.

### ADDITIONAL CONSIDERATIONS

Lastly, the Court finds it appropriate to examine the impact that partially sequestered and anonymous juries have on the court system. The financial condition of the federal courts is a serious concern for the courts, the public, and members of the

bar. In Fiscal Year ("FY") 2004, appropriations provided by Congress, while a modest increase from 2003, were insufficient to maintain the court staffing levels that existed in FY 2003. Courts have been forced to terminate employees. Other employees have been furloughed or offered early retirement. Some courthouses have reduced public hours and services. In this troubling climate, all courts, including this court, are preparing contingency plans, hoping for the best, but fearing the worst.

This fear is well-founded. Congress is in the midst of passing a budget that would freeze overall appropriations at FY 2004 levels. Joyce E. Kitchens, President of the Federal Bar Association, wrote a letter to Congress in which she made the case for additional funding for federal courts, noting that the current and projected appropriations levels are so insufficient that a crisis threatens to overtake the federal courts. *See* The Third Branch: Newsletter of the Federal Courts, Vol. 36, Number 5 (May 2004), *available at* *http://www.uscourts.gov/ttb/may04ttb /fund/index.html* (last visited June 8, 2004). If funding is not increased, President Kitchens wrote, "it is expected that the federal courts will be forced to cut operating expenses in half, and to fire or lay off an estimated 3,800 court employees, representing almost twenty percent of the probation and clerks' office personnel." *Id.*

Notwithstanding the lack of resources, the courts have been asked to do more with less. Today, there are over 4,000 offenses that carry criminal penalties in the United States Code. *See* John S. Baker, Measuring the Growth of Federal Crime Legislation, The Federalist Society for Law and Public Policy Studies, *at* http://www.fed-soc.org/Publications/practi-

cegroupnewsletters/criminallaw/crim-reportfin al.pdf (last visited June 8, 2004). This is a record number, and reflects a one-third increase since 1980. *Id.* Appropriate resources to fund these new responsibilities have been lacking.

Given this dire state of financial affairs, a request for a partially sequestered and anonymous jury takes on new significance. In this case, the Court has considered the relevant factors and finds that justice requires a partially sequestered and anonymous jury. Yet the proper administration of justice also requires retention of the staff and services needed to fulfill the courts' other constitutionally and congressionally mandated responsibilities.

We are rapidly approaching the point at which it may be necessary to consider additional factors when weighing a request for jury anonymity and sequestration. If Congress remains unwilling or unable to rectify the precarious financial condition of the federal court system, perhaps it is time to consider a new method of distributing these costs. Currently, the courts assume the majority of the costs. Under one model of such a new method, the government would allocate the necessary funds to meet its requests for additional jury selection and maintenance procedures.

SO ORDERED.