**UNITED STATES of America,**
Plaintiff,

v.

**Salvatore LOCASCIO, et al., Defendants.**

**No. 03 CR 304(CBA).**

United States District Court, E.D. New York.

Feb. 2, 2005.

Eric P. Franz, Law Offices of Eric Franz, Maurice H. Sercarz, Sercarz & Riopelle, New York, NY, for Defendants.

Eric Ross Komitee, Jeffrey Alan Goldberg, Linda A. Lacewell, Thomas Alan Firestone, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

*AMENDED MEMORANDUM*
*& ORDER*

AMON, District Judge.

The government has moved to empanel an anonymous and partially sequestered jury for the trial of this case. Specifically, it requests "that the names, addresses and places of employment of the prospective jurors not be revealed to either the parties or their attorneys," and that "from the time each juror survives any challenges for cause on peremptory challenges until the end of the trial, the jurors be escorted by representatives of the United States Marshals Service to and from the courthouse each day, and to and from the locations to which they recess for lunch, when they are not at lunch in the jury room." (Govt. Nov. 22, 2005 Motion at 1). The defendants argue that selection of an anonymous jury deprives them of their rights under the Fifth and Sixth Amendments. Although they recognize that the law permits the court to select an anonymous jury in an appropriate case, they contend that this is not such a case.

■ The legal principles governing selection of an anonymous jury are well-settled. An anonymous jury is appropriate only where (1) there is a strong reason to believe that the jury needs protection, and (2) reasonable precautions are taken to minimize the effects of such a decision on the defendants and to ensure that their fundamental rights are protected. *United States v. Vario*, 943 F.2d 236, 239 (2d Cir.1991); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir.1985); *United States v. Thai*, 29 F.3d 785, 800 (2d Cir. 1994). Within those parameters, however, the decision whether or not to empanel an anonymous jury is within the discretion of the trial court. *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991); *United States v. Persico*, 1994 WL 150837 at *1 (E.D.N.Y. Apr.20, 1994).

■ A review of the relevant case law highlights a number of factors that are usually taken into consideration when determining whether or not the jury needs the protection of anonymity. These include (1) the seriousness of the charges; (2) the dangerousness of the defendants; (3) the defendant's ability to interfere with the judicial process by himself or through his associates; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair. *United States v. Cacace*, 321 F.Supp.2d 532, 534 (E.D.N.Y.2004); *see Thai*, 29 F.3d at 801; *Thomas*, 757 F.2d at 1364–66; *Paccione*, 949 F.2d at 1192; *United States v. Barnes*, 604 F.2d 121, 141 (2d Cir.1979); *Persico*, 832 F.2d at 717.

■ Preliminarily, this Court recognizes that empaneling an anonymous jury is a very serious decision and has given this matter a considerable degree of thought. This Court does not treat the request to proceed with an anonymous jury as a routine application, even though it is an unfortunate reality that a significant number of the cases tried in this district have required proceeding with such a selection process. Each case must be judged on its own facts. Contrary to defendants' position, the government has not simply waived the red flag of the defendants' membership in organized crime and sought to secure an anonymous jury on that fact alone. Rather, the government has persuaded the Court that, based on the totality of the circumstances surrounding this case, the application must be granted. The Court turns to analysis of the relevant considerations.

The individual defendants in this case, all of whom are alleged to be either made

members or associates of the Gambino Family of La Cosa Nostra, are charged with racketeering, racketeering conspiracy, and money laundering conspiracy. Certain of the defendants are also charged with mail and wire fraud conspiracy with regard to two separate fraudulent schemes, two counts of both mail and wire fraud, and four counts of money laundering. The racketeering charges identify the Gambino Family as the racketeering enterprise, and charge that its purpose was "the generation of money for its members and associates through various predicate crimes," including fraud and money laundering. The mail and wire fraud charges allegedly arise from two separate schemes to defraud: in the first scheme, the telephone bills of millions of consumers were charged for services which they had not requested ("the telephone cramming scheme"); in the second scheme, visitors to adult entertainment websites run by certain defendants were allegedly misled into believing that they were receiving a free tour, while in reality charges were levied to their credit cards, which they had provided for age verification purposes ("the internet scheme"). The proceeds from these schemes—also charged as RICO predicate acts—are alleged to have been in the hundreds of millions of dollars, and were allegedly transferred by certain defendants, "in fulfillment of Richard Martino's obligation as a member of organized crime to share illicit proceeds with persons above him in the Gambino family." If convicted of these charges the defendants face very substantial prison terms based upon the enormous sums of money that were alleged to have been obtained by fraud and then laundered. None of the defendants are young men, and the substantial prison terms and financial penalties they face provide a motive to tamper with the jury. *United States v. Bellomo*, 263 F.Supp.2d 557, 559 (E.D.N.Y.2003)

(citing *United States v. Edwards*, 303 F.3d 606 (5th Cir.2002)).

The defendants seek to distinguish this case from many of those in which anonymous juries have been ordered on the grounds that the charges do not involve violence. It is true that no element of the charges requires proof of any assaultive or violent act, and it is unclear at this point whether any evidence of violence will be elicited at trial. But this distinction misses the point. The concern in this case is not that anonymity is necessary to assuage jurors' fears for their personal safety. Rather, the concern is that if jurors identities are revealed they can easily be contacted and offered bribes.

The most compelling factor justifying an anonymous jury in this case is the defendant Richard Martino's demonstrated willingness to "tamper ... with the judicial process." *Vario*, 943 F.2d at 239. This factor has been described as "crucial" to the determination to empanel an anonymous jury. *Id.* at 239. Here the government points to the recent indictment of Martino for witness tampering. The government proffers that Martino paid $890,000 to Bruce Chew, who at the time was a potential witness against him, to prevent him from cooperating with the government in this case. It is proffered that Chew, who will be a trial witness for the government, will testify that these payments for counsel and living expenses were "hush money." Although Martino, through his counsel, denies any intent to obstruct justice, the defendant does not deny making the payments to Chew and even goes as far as to concede that he "may have harbored the hope that, by subsidizing Chew's legal and living expenses, Chew might remain part of the joint defense effort and not become a cooperating witness." (Defendants' Dec. 20 Response at 17.) Despite Martino's ef-

forts to portray these payments as acts of charity, the grand jury found probable cause to believe that these payments were made "knowingly and intentionally ... to corruptly persuade" the witness not to communicate information to law enforcement officers about the very case before the Court. The sheer magnitude of the payment supports that finding and provides the Court with significant concerns about maintaining the integrity of this jury.[1] In sum, Richard Martino has access to substantial sums of money and the proffered facts demonstrate the willingness to corrupt the judicial process.

The government also relies on other acts of obstruction tied to Martino. Specifically, it points to co-defendant Kenneth Schaeffer's guilty plea to obstruction of justice for disposing of evidence crucial to the cramming scheme charges in the present indictment, at a time when an administrative investigation of the internet scheme was underway. Although Schaeffer never explicitly implicates any of the defendants in his actions, he allegedly states that he acted at the direction of supervisors at Mical, Richard Martino's company. The government alleges that the evidence at trial will show that, based on the corporate structure of Mical and Martino's control over the company, any such instructions for the destruction of evidence would have had to have been personally ordered by Martino himself. Although not as dramatic as the proffered payoff to Chew, this episode nonetheless contributes to the totality of circumstances supporting the government's application.

■ The organized crime status of the defendants, although not alone sufficient to support empaneling an anonymous jury, is plainly not irrelevant. *Edwards,* 303 F.3d at 613; *Thomas,* 757 F.2d at 1364; *Cacace,*

321 F.Supp.2d at 535; *Bellomo,* 263 F.Supp.2d at 559; *Persico,* 621 F.Supp. 842, 877–80. The indictment charges that Richard Martino was a soldier in the Gambino crime family and that Locasio was a capo. Thus Martino, who himself has shown a willingness to corrupt the judicial process, also has strong and influential ties to an organization whose members have a documented history of seeking to tamper with juries and who could provide the support necessary to achieve that objective.

■ The government points to other information establishing the dangerousness of the defendants. Much of the proffer, however, carries little, if any, weight due to the failure of the government to provide adequate support for its allegations. The Court declines to rely on "confidential source information" where there is no indication of the reliability of such information. The one exception is the government's proffer that the defendant Richard Martino ordered the 1992 kidnapping and beating of Philip Bailey over a business dispute with Bailey's boss Richard Desmond. At least three identified witnesses will offer testimony concerning these events. It is proffered that one such witness will be co-defendant Norman Chanes, who only recently agreed to cooperate with the government. According to the government's proffer, Chanes will testify that Martino learned that Bailey would be traveling to New York on business and asked Chanes to find out when he would be arriving and leaving, where he would be staying. He will further testify that Martino indicated his intention to "send a car" for Bailey and to give him a "message" for his boss, Desmond. The government has also proffered that Chew will testify regarding a conversation with Martino in which Martino told

---

1. In addition, Richard Martino's company Mical paid the legal fees of three other codefendants, including Kenneth Schaeffer. Although no claim is made that these payments were acts of obstruction, they do evidence Martino's access to substantial sums of cash.

him that he had Bailey "shaken up pretty good" to get back money that Desmond owed him. In addition, Martino has recently been charged in an indictment which lists, as a RICO predicate, an extortion conspiracy pertaining to this event. Although the Court recognizes that this allegation of violence occurred over ten years ago, it is nonetheless evidence of the character of the defendant Martino and the lengths to which he will go to achieve his objectives.

The factor of publicity also favors an anonymous jury. There have already been numerous newspaper articles in local publications focusing on this trial and the charges therein. As recently as January 9, 2004, an article published in the Daily News entitled *Mob-linked Guy Admits Phone Scam*, discusses the guilty plea of a person related to the defendant corporation, USP & C. John Marzulli, *Mob-linked Guy Admits Phone Scam*, Daily News, Jan. 9, 2004, at 13. The article names Richard Martino and Chanes and discusses Chanes' recent decision to cooperate with the government. Although there is no way of knowing for certain the extent to which this coverage will continue throughout the duration of the trial, there is also no reason to believe that it will cease or even decrease once trial begins. The Court cannot recall a single status conference in this case in which the members of our press corps have not been present. Moreover, it is difficult to imagine that the tabloid press could resist reporting on witnesses who will testify to being defrauded because they did not understand that their free internet tour of pornography had ended. Because publicity may result in the identities of jurors becoming public and increase the possibility of intimidation, pressure, and harassment, publicity is a factor to take into consideration. *Vario*, 943 F.2d at 240.

In sum, given the seriousness of the charges, the lengthy prison sentences that convictions would entail, the evidence of Martino's efforts to interfere with the judicial process, and the ability of the defendants to enlist the resources of the Gambino crime family, an organization with a documented history of juror intimidation, this Court concludes that "[u]pon balancing the government's interest in safeguarding jurors with the defendant's interest in avoiding erosion of the presumption of innocence, the scale in this case tips in the government's favor." *Thomas*, 757 F.2d at 1364.

The Court should note that it considered the defendant's novel proposal that the Court empanel eighteen jurors and select the twelve jurors who will deliberate by lottery at the end of trial, but found it to be an ineffective method of protecting the jurors. First, such a procedure does not prevent illicit contact with members of the jury; it only diminishes the odds of success. Moreover, in light of the anticipated length of the trial, it is quite likely that by the conclusion of the trial, the odds will be even more in favor of one inclined to corrupt the process. Although the Court will select six alternate jurors, it has been this Court's experience in trials of similar length that the number of alternate jurors will be greatly reduced by the time the deliberation process is set to begin. Indeed, it is also the very length of this trial that magnifies the potential for problems with the jury. Although a short trial may make the successful contact and corruption a juror difficult, in a trial of extended duration, there are many more opportunities to achieve that objective.

In empaneling an anonymous jury, the Court is mindful of the importance of maintaining the defendants' presumption of innocence and the need to ensure that the defendants are not preju-

diced by this decision. The Court has and will therefore take reasonable measures to prevent such prejudice, such as providing the jurors with a neutral explanation of the reasons for which these measures will be taken. Indeed, while maintaining their objection to the selection of an anonymous jury, the defendants approved the instruction to the jurors concerning their anonymity which appears in the introduction to the juror questionnaire as well as the Court's proposed instructions regarding the partial sequestration. To the extent that the defendants raised Sixth Amendment concerns, the Court simply observes that a detailed and lengthy questionnaire, drafted principally by defense counsel and including almost all the questions they sought, has been distributed to jurors. As a practical matter, the defendants learn far more about prospective jurors from the answers to the questionnaires than they would learn from the voir dire that is conducted when a jury is not anonymous. Moreover, even in a regular jury selection, the jurors are not called upon to divulge their address or the name and address of their employer. Hence, the only additional information kept from the defendants is the juror's name. At best, a name may provide an indication of ethnicity, but ethnicity is often determinable by appearance. In any event, it is an impermissible basis on which to exercise challenges.

■ Finally, the Court also rejects the defendant Daniel Martino's motion for a severance. Where there is sufficient evidence, as here, that the actions of his co-defendant merit an anonymous jury, and where, as here, the Court provides the jury with a nonprejudicial reason for anonymity, severance is not mandated because the defendant in particular had not sought to obstruct justice. *United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir.1995).

Accordingly, this Court orders that the following measures be taken:

1. The names, addresses, and places of employment of the prospective jurors will not be disclosed;

2. Every morning, the jurors will be picked up by the United States Marshals at an undisclosed central location and transported to the courthouse and to the jury room of the courtroom in which this trial will be held;

3. At the end of each day, the jurors will be transported by the United States Marshals from the courthouse to an undisclosed central location from which they can depart for their respective homes and communities; and

4. The jurors shall be escorted by the United States Marshals to and from any locations at which they may recess for lunch, when they are not lunching in the jury room.

So Ordered.